**In re CENDANT CORPORATION DERIVATIVE ACTION LITIGATION.**

No. CIV.A. 98–1998.

United States District Court, D. New Jersey.

Aug. 9, 1999.

Bruce E. Gerstein, Barry S. Taus, Brett Cebulash, Kevin S. Landau, Garwin, Bro-

nzaft, Gerstein & Fisher, L.L.P., New York City, David M. Taus, Francis J. DeVito, P.A., Hackensack, NJ, Elwood S. Simon, John P. Zuccarini, Elwood S. Simon & Associates, P.C., Birmingham, MI, for Plaintiff Martin Deutch.

Carl Greenberg, Michael M. Rosenbaum, Budd Larner Gross Rosenbaum Greenberg & Sade, P.C., Short Hills, NJ, Jonathan J. Lerner, Jerome S. Hirsch, Samuel Kadet, Skadden, Arps, Slate, Meagher & Flom LLP, New York City, for Defendant Cendant Corporation.

Herbert J. Stern, Stephen M. Greenberg, Joel M. Silverstein, Stern & Greenberg, Roseland, NJ, James G. Kreissman, Michael J. Chepiga, Jacob S. Putman, Sasha A. Smith, Simpson Thacher & Bartlett, New York City, for HFS Defendants.

Steven S. Radin, Sills Cummis Zuckerman Radin Tichman Epstein & Gross, Newark, NJ, Greg A. Danilow, Stephen A. Radin, Timothy A. Greensfelder, Weil, Gotshal & Manges LLP, New York City, Dennis J. Block, Howard R. Hawkins, Jr., Cadwalader, Wickersham & Taft, New York City, for CUC Defendants.

Richard Schaeffer, Bruce Handler, Dornbush Mensch Mandelstam & Schaeffer, LLP, New York City, for Defendant E. Kirk Shelton.

Anne M. Patterson, Riker, Danzig, Scherer, Hyland & Perretti, LLP, Morristown, NJ, Daniel J. Beller, Brad S. Karp, Michael E. Gertzman, Jennifer L. Romer, Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for Defendant Amy N. Lipton.

Kathleen H. Dooley, Shanley & Fisher, P.C., Morristown, NY, Paul C. Curnin, Simpson Thacher & Bartlett, New York City, for Defendant Bear Stearns & Co., Inc.

Donald A. Robinson, Leda Dunn Wettre, Robinson, Lapidus & Livelli, Newark, NJ, Gary P. Naftalis, Alan R. Friedman, Kramer Levin Naftalis & Frankel LLP, New York City, for Defendant Cosmo Corigliano.

## OPINION

WALLS, District Judge.

## I. Introduction

This matter is before the Court on the motions of Cendant Corporation ("Cendant"), the HFS defendants, the CUC defendants, Bear Stearns, and the individual defendants E. Kirk Shelton, Amy Lipton, and Cosmo Corigliano to dismiss the verified amended derivative complaint ("complaint") against them. The motion of defendants Shelton and Corigliano to dismiss Count I of the complaint is granted. The motion of defendant Bear Stearns to dismiss the complaint is granted. Defendant Lipton's motion to dismiss the complaint against her for lack of personal jurisdiction is granted. The CUC defendants' motion to dismiss Counts II and III against defendant Forbes is granted. All other motions are denied.

## II. Background

At all relevant times, plaintiff Martin Deutch is and was a shareholder of nominal defendant Cendant. He brings this shareholder's derivative action, on behalf and for the benefit of Cendant "to remedy the gross abuse of trust and loyalty committed by the defendants named [in the complaint], who include, *inter alia*, a majority of Cendant's Board of Directors." (Am.Compl. ¶ 1.) This suit arises out of the merger (the "Merger") of CUC International, Inc. ("CUC") with HFS Incorporated ("HFS") to form Cendant on December 17, 1997. During the next four months, Cendant's stock price increased by 25%. (Id. at ¶ 4.) On April 15, 1998, after the close of the stock market, Cendant announced that due to "accounting irregularities" in certain former CUC business units, it expected to restate its annual and quarterly financial statements for 1997 and possibly for earlier periods as well. (Id. at ¶ 5.) Cendant estimated that it would reduce its 1997 income by $100–115 million and earnings per share by 11 to 13 cents. (Id. at ¶¶ 5, 88–89.) Cendant also announced that it had hired the law firm of Willkie Farr & Gallagher as special legal counsel which, in turn, hired Arthur Andersen LLP (the "independent investigators") to perform an independent investigation. The next day, Cendant's stock

fell by $16.56 per share or nearly 50%, and Cendant lost over $15 billion in market capitalization. (Id. at ¶¶ 5, 91.) Shareholders filed suits under the securities laws in this and other districts against Cendant, its officers, directors, and other parties. On April 27, 1998, plaintiff Deutch brought this derivative action against nominal defendant Cendant, its officers, directors, and Bear Stearns, the financial advisor to HFS about the Merger.

On July 14, 1998, Cendant announced that CUC's income for the 1995, 1996, and 1997 fiscal years had been overstated by more than $500 million. (Id. at ¶ 6.) Following this announcement, on July 28, 1998, Cendant's board of directors met with the independent investigators. (Id. at ¶ 7.) On that day, Walter Forbes and nine former CUC directors agreed to resign. (Id. at ¶¶ 7–8.) Finally, on August 28, 1998, Cendant filed with the SEC a report ("Report") prepared by the independent investigators which disclosed that CUC and Cendant's income for 1995, 1996, and 1997 had been overstated by approximately $500 million. (Id. at ¶ 117.) The Report concluded that these overstatements were achieved through improper topside adjustments to quarterly income, manipulation of merger reserves, accelerated revenue recognition, and the understatement of membership cancellation reserves. (Id.) On December 8, 1998, plaintiff filed this amended verified derivative complaint which defendants now move to dismiss.

Plaintiff alleges that Cendant's twenty-eight directors (fourteen from CUC and fourteen from HFS) "improperly granted themselves and Cendant's senior officers enormous financial incentives to complete the Merger and created enormous incentives for its investment banker, Bear Stearns to opine in favor of the Merger." (Pl.'s Mem. at 2.) Plaintiff complains that "to ensure the Merger's completion, Defendants issued numerous materially false and misleading statements regarding [Cendant's] income and finances, and the Defendants' due diligence in the Merger." (Id.) Plaintiff Deutch did not demand that the directors of Cendant sue themselves because, he maintains, such demand would have been futile.

Plaintiff has sued Cendant as a nominal defendant, together with the Bear Stearns Companies, Inc. and its subsidiary, Bear Stearns and Co., Inc., engaged by HFS as its advisor on the Merger (collectively the "Bear Stearns defendants"), and individual defendants who were officers and/or directors of Cendant. The individual defendants are Henry R. Silverman, Walter A. Forbes, T. Barnes Donnelley, Martin L. Edelman, Stanley Rumbough, Jr., John D. Snodgrass, Stephen P. Holmes, James E. Buckman, Bartlett Burnap, Burton C. Perfit, Michael P. Monaco, Christopher K. McLeod, Robert D. Kunisch, E. Kirk Shelton, Robert T. Tucker, E. John Rosenwald, Jr., Cosmo Corigliano, and Amy N. Lipton. (Am.Compl. ¶ 18.) With the exception of defendants Lipton and Corigliano, the individual defendants comprised a majority of Cendant's board of directors at the time this suit was filed and are referred to in the complaint as the "Director Defendants." (Id.)

The complaint alleges that the individual defendants, "through their positions as senior officers and/or directors of [Cendant] and their receipt of reports, attendance at meetings and access to all of [Cendant's] books, records and other proprietary information, had responsibility for, and therefore, material non-public information regarding, inter alia, (a) the accuracy and reliability of [Cendant's] financial statements and/or accounting practices; and (b) [Cendant's] true earnings." (Am.Compl. ¶ 20.) Plaintiff asserts that with all this information, the individual defendants knew, or should have known, that Cendant's publicly issued financial statements for 1997 were false because they did not conform to generally accepted accounting principles ("GAAP"). (Id. at ¶ 21.) According to the complaint, the individual defendants issued materially false and misleading statements regarding Cendant's financial condition and the results of its operations. (Id. at ¶ 22.) Plaintiff alleges that the individual defendants breached their fiduciary duty of loyalty because they, acting on material insider information, sold over four million shares of Cendant stock at artificially inflated prices to realize approximately $180 million for their own personal gain. (Id.)

The complaint charges that the individual defendants consummated the Merger for their own benefit. According to it, defendants Forbes and Silverman first discussed a possible merger in April, 1997. (Am.Compl. ¶ 33.) On May 2, 1997, HFS engaged Bear Stearns, with which it had a long-standing relationship, as its financial advisor on the Merger. (Id. at ¶ 35.) Defendant Silverman and the other HFS directors agreed to pay Bear Stearns a $4 million fee for a "fairness opinion" with regard to the Merger, and an additional $26 million if the Merger was consummated. (Id. at ¶¶ 17, 36.) Plaintiff asserts that Bear Stearns and the HFS directors with access to CUC's internal reports and documents failed to disclose that CUC had overstated its earnings by one-third. (Id. at ¶ 39.) Plaintiff contends that both the HFS and CUC individual defendants consummated the Merger "to enhance their personal power and wealth." (Id. at ¶ 41.) As part of the Merger, defendants Silverman, Forbes, Shelton, McLeod, Monaco, Holmes, Buckman, Lipton, and Corigliano each received special compensation packages. (Id.) In 1997, defendant Silverman was granted stock options valued at approximately $280 million. (Id. at ¶ 18(a).) Defendant Forbes received stock options valued at approximately $65 million. (Id. at ¶ 18(b).) In addition to the grants of stock options and shares of restricted stock that were made to defendants Silverman, Monaco, Holmes, Buckman, Forbes, and McLeod, other officers and key employees of Cendant were granted an aggregate of 8.625 million stock options and shares of restricted stock, with a fair market value of $26.4 million. (Id. at ¶ 41.)

The complaint alleges that the CUC defendants inflated their earnings through wrongful accounting practices "to keep CUC's market value as high as possible and provide themselves the benefits of inflated CUC earnings." (Id. at ¶ 44.) CUC's management had done so in the past as well: in 1989, CUC was forced to restate its earnings and take a $51 million charge; in 1994, CUC's accounting practices were criticized by the Center for Financial Research & Analysis, a Baltimore based provider of reports to institutional investors, which estimated that CUC's income was $31.5 million

lower than reported in fiscal 1994 and $6.2 million lower for the first nine months of fiscal 1995. (Id. at ¶¶ 45–47.) Before the Merger, CUC's debt rating was "BBB", but as a result of the Merger, its debt rating improved to "A-". (Id. at ¶ 53.)

Plaintiff asserts further that the individual defendants misleadingly promoted Cendant as a growth company on multiple occasions from at least August 28, 1997, when they caused CUC and HFS to issue the Registration Statement. (Id. at ¶ 48.) Although they repeatedly touted Cendant as a "growth company," the individual defendants sold almost 4 million shares of their own stock in Cendant for $180 million after the Merger while in the possession of materially adverse, inside information. (Id. at ¶¶ 18, 48–58.) On December 18, 1997, defendant McLeod sold 62,620 shares for $1.97 million. (Id. at ¶ 18(m).) Defendant Forbes sold 75,146 shares for $2.36 million on December 28, 1997, and defendant Burnap sold 75,000 shares for $2.63 million on January 22, 1998. (Id. at ¶ 18(b), (g).) On February 3, 1998, Ernst & Young, CUC's auditor, told Cendant's Audit Committee that CUC's income for the month of January, 1997 was overstated by $23 million. (Id. at ¶ 63.) On February 4, Cendant announced its materially false and misleading financial earnings for 1997 which included this $23 million overstatement. (Id. at ¶¶ 63–64.) On February 5–6, 1998, defendant Silverman sold a total of 1.7 million shares, every share of stock that he owned in Cendant, for $61,420,239. (Id. at ¶ 68.) On February 6, 1998, defendant Buckman sold 300,000 shares for $10.8 million. (Id. at ¶¶ 18(h), 68.) Defendant Perfit sold 3,938 shares for $140,000 on February 10, 1998, and defendant Rumbough sold 50,000 shares for $1.78 million. (Id. at ¶¶ 18(i), (e), 68.) Between February 25, 1998 and March 17, 1998, defendant Snodgrass sold 811,423 shares for over $31 million, defendant Burnap sold 625,000 shares for nearly $24 million, defendant Forbes sold 300,000 shares for over $11 million, defendant Rumbough sold 25,938 shares for nearly $1 million, defendant Edelman sold 60,000 shares for nearly $2.5 million, and defendant Donnelley sold 100,000 shares for over $4 million. (Id. at ¶ 18, 77.) On April 6–7, 1998, defendant Snodgrass sold 793,026 shares for almost $32 million. (Id. at ¶ 81.)

The complaint alleges that on January 27, 1998, defendants Silverman and Forbes jointly announced Cendant's $2.7 billion bid for American Banker Insurance Group, Inc. ("ABI") and stated that the deal was "not subject to any due diligence or financing conditions." (Id. at ¶¶ 59–60.) Plaintiff asserts that "Silverman and the other Individual Defendants had become so self-consumed by their desire to effectuate ever larger deals, that they had dispensed with conditioning of mergers on the undertaking of the due diligence process to investigate the integrity of the target Company." (Id. at ¶ 60.) "The Individual Defendants, bowing to the desires of Defendants Silverman and Forbes, abdicated their fiduciary duties of loyalty and care to the Company by writing Defendants Forbes and Silverman a blank check to acquire [ABI], regardless of the terms of the transaction and regardless of whether or not a proper (or any) due diligence was performed." (Id. at ¶ 61.)

The complaint charges that the individual defendants caused Cendant to issue several false and misleading financial statements and reports even after the Merger. On February 4, 1997, Cendant issued a false financial report for the fourth quarter ended December 31, 1997 and for the fiscal year ended December 31, 1997. (Id. at ¶ 64.) On February 20, 1998, Cendant filed with the SEC a Form S–4 Registration Statement in connection with its offer to purchase ABI which set forth the false financial results that Cendant had announced on February 4, 1997. (Id. at ¶ 69.) On March 31, 1998, Cendant filed a false Annual Report on Form 10–K with the SEC for the year ended December 31, 1997. (Id. at ¶ 79.)

The complaint claims that the individual defendants' "knowledge, or reckless disregard of the truth regarding [Cendant's] earnings is demonstrated by the fact that the 'accounting irregularities' were so basic that they were discovered within one day after the Defendants purportedly began to investigate." (Id. at ¶ 148.) The knowledge of these defendants is "demonstrated by their

alleged 'due diligence' during the Merger at which time they had access to and conducted a review of relevant documents regarding CUC earnings." (Id. at ¶ 132.) Defendants' knowledge is also evidenced by the May 27, 1997 Bear Stearns Opinion Letter, in which Bear Stearns wrote that in its determination of the fairness of the Merger, it had relied upon certain material non-public information provided by the individual defendants which would have required it to review CUC's and HFS's accounting policies and practices. (Id. at ¶ 133.) Plaintiff alleges that defendants either knew of, or recklessly disregarded the existence of accounting irregularities before the Merger based on the following factors:

(a) the existence of numerous red-flags regarding CUC's prior accounting machinations in 1989, 1991, and 1994; (b) that the type of investigation that HFS typically engaged in was designed to catch the exact type of wrongdoing involved here—namely an antiquated accounting system that allowed for manual entries and adjustments; (c) that Defendants represented in the Registration Statement that they were provided full access to necessary books and records; (d) that Silverman demanded and received daily cash flow figures and detailed financial reports as part of his management style; and/or (e) the conclusion reached by the Audit Committee's investigation that HFS was denied access to the usual level of detail with which it conducts its due diligence investigations, raising a red-flag that CUC had something to hide. (Am.Compl. ¶ 129.)

Plaintiff claims that after the Merger, the individual defendants knew of or recklessly disregarded the accounting irregularities based on the following facts:

(a) [Cendant], in a highly unusual and undisclosed arrangement, continued to maintain separate accounting functions after the Merger; (b) prior to the February 4, 1998 release of Cendant's 1997 financial results, the Audit Committee was specifically informed that CUC's income for the month of January, 1997 was overstated by in excess of $23 million and could not be reconciled; (c) in January 1998, Cendant's Corporate Controller, a former HFS employee, independently reached the same

conclusion regarding the overstatement of CUC's January 1997 income; (d) Silverman and Monaco were involved in renegotiating a contract with CNA from which [Cendant] improperly recorded $30 million as current income in 1997; and (e) by no later than March 9, 1998, Silverman and other former top HFS officers and directors had been told that in excess of $100 million of 1997 income was non-recurring and that more than $200 million in adjustments were necessary in order for CUC to meet its budget for 1998. (Am.Compl. ¶ 130.)

Plaintiff argues that after Cendant announced the accounting irregularities, the individual defendants sought to protect themselves from personal responsibility and conferred additional financial benefits upon themselves. (Pl.'s Mem. at 13.) After the announcement, a power struggle ensued between the former HFS and CUC directors. (Id. at 14.) Silverman led the HFS faction and blamed Forbes and CUC for the scandal. (Id.; Am. Compl. ¶¶ 100, 152.) Forbes and the CUC faction denied any wrongdoing. During this struggle, on July 14, 1998, Cendant disclosed that its income was overstated by over $500 million, not the $100 million it had estimated. (Pl.'s Mem. at 14; Am. Compl. ¶¶ 6, 96). On July 28, 1998, "[i]n exchange for $47.5 million and an agreement that they would walk away without the threat of personal liability, Forbes and nine CUC directors resigned and ceded control of [Cendant] to Silverman and HFS." (Pl.'s Mem. at 15; Am. Compl. ¶¶ 104–116). As part of the deal, the board agreed to delegate to a Litigation Committee, composed of an equal number of CUC and HFS members (no more than four in total), "complete and utter control and discretion over this action and any other direct or derivative actions." (Pl.'s Mem. at 15; Am. Compl. ¶¶ 104–116.) They also agreed to pay Forbes a $47.5 million severance package and to heighten the indemnification rights of Forbes and other CUC directors in exchange for their agreement to resign. (Pl.'s Mem. at 15; Am. Compl. ¶¶ 7–8, 105–106.) According to plaintiff, the "By-Law creating the Litigation Committee was en-

acted to ensure that the HFS faction, which was taking control of [Cendant], would be blocked from initiating a lawsuit or permitting a derivative action to proceed against the CUC directors unless the CUC representatives on the Committee approved. The Litigation Committee was created for the obvious purpose of insulating Forbes and the CUC Directors from liability once they resigned from office." (Pl.'s Mem. at 15.) Plaintiff claims that this Litigation Committee "was required to contain an equal number of CUC and HFS directors, with a vote along party lines blocking pursuit of any claim." (Pl.'s Mem. at 6.) In addition, on September 23, 1998, "Defendant Silverman's handpicked Compensation Committee" repriced the stock options granted to defendants Silverman, Buckman, Holmes, Monaco, and Kunisch which had been rendered worthless by the decline in Cendant's stock price. (Am.Compl. ¶¶ 121–126, 169.) Plaintiff alleges that this repricing provided these defendants with a benefit in excess of $100 million and caused Cendant to be severely criticized by Wall Street. (Id. at ¶¶ 122–126.)

Plaintiff asserts that the individual defendants "have harmed [Cendant] through their continuing scheme of issuing material false and misleading financial statements, implementing improper accounting practices and personally profiting through insider sales of stock based on their misappropriation of proprietary internal (and adverse) corporate information." (Am.Compl. ¶ 156.) According to the complaint, the misdeeds of the individual defendants "ha[ve] exposed and will continue to expose [Cendant] to enormous legal liability and costs." (Id.) Defendants' wrongdoing has caused Cendant to incur "well over $500 million in out-of-pocket costs and has damaged Cendant's credit ratings, reputation and credibility." (Id.) The cost of the Audit Committee's accounting investigation and of the severance package for Forbes was over $100 million. (Id. at ¶ 158.) The financial fraud has rendered Cendant's financial statements unreliable. (Id. at ¶ 160.) The accounting irregularities have also damaged Cendant's ability to use stock to acquire additional prospects and called the internal controls and stability of Cendant's operations into question. (Id. at ¶¶ 163–166.)

Count I of the complaint is a derivative action for breach of fiduciary duty for insider trading and misappropriation of corporate information against all of the individual defendants. (Am. Compl. Count I, ¶¶ 175–190.) The complaint also charges the individual defendants with waste of corporate assets, mismanagement, gross negligence, and breach of their fiduciary duties of loyalty, good faith, and exercise of due care. (Am. Compl. Count II, ¶¶ 191–196.) In Count III of the complaint, the individual defendants and the Bear Stearns defendants are charged with gross negligence. (Am. Compl. Count III, ¶¶ 197–200.)

The defendants now move to dismiss the complaint. Nominal defendant Cendant, the CUC defendants (Burnap, Donnelley, Forbes, McLeod, Perfit, Rumbough, and Tucker), the HFS defendants (Silverman, Edelman, Snodgrass, Buckman, Monaco, Holmes, Kunisch, and Rosenwald), and Bear Stearns argue that the complaint should be dismissed because plaintiff failed to demand that the directors bring this action and has failed to adequately plead demand futility. Nominal defendant Cendant contends that the insider trading, breach of fiduciary duty, and gross negligence claims are not supported by allegations of particularized fact that would excuse demand. The CUC defendants insist that plaintiff's claims are barred by Cendant's certificate of incorporation, that Cendant has already released defendant Forbes from liability for certain claims, and that a number of the CUC defendants were outside directors and were never employed by Cendant. The CUC defendants also move for a stay of this action pending resolution of an action by other Cendant shareholders in Delaware Chancery Court, *Corwin, et al. v. Silverman, et al.*, 1999 WL 499456, No. Civ.A. 16347 (Del.Ch.1999). The HFS directors argue that the insider trading claim lacks specificity and fails to state a claim under New Jersey law and that plaintiff's claims are barred by the certificate of incorporation. Defendant Shelton contends that plaintiff has failed to state a claim for insider trading, breach of fiduciary duty, and gross

negligence, and has failed to set forth a cognizable theory of damages. Defendant Lipton insists that this Court lacks personal jurisdiction over her and that plaintiff has failed to plead fraud with particularity. Defendant Bear Stearns argues that Deutch has no standing to sue on behalf of HFS and that it owed no duty of care to Cendant. Defendant Corigliano adopts the arguments of the other defendants.

## III. Discussion

### A. Motion to Dismiss Standard

On a motion to dismiss pursuant to Fed. R.Civ.P. 12(b)(6), the court is required to accept as true all allegations in the complaint, and all reasonable inferences that can be drawn therefrom, and to view them in the light most favorable to the non-moving party. *See Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1384 (3d Cir.1994). The question is whether the claimant can prove any set of facts consistent with his/her allegations that will entitle him/her to relief, not whether that person will ultimately prevail. *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984). While a court will accept well-pleaded allegations as true for the purposes of the motion, it will not accept unsupported conclusions, unwarranted inferences, or sweeping legal conclusions cast in the form of factual allegations. *See Miree v. DeKalb County, Ga.*, 433 U.S. 25, 27 n. 2, 97 S.Ct. 2490, 2492 n. 2, 53 L.Ed.2d 557 (1977). Moreover, the claimant must set forth sufficient information to outline the elements of his claims or to permit inferences to be drawn that these elements exist. *See* Fed.R.Civ.P. 8(a)(2); *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957). The Court may consider the allegations of the complaint, as well as documents attached to or specifically referenced in the complaint, and matters of public record. *See Pittsburgh v. West Penn Power Co.*, 147 F.3d 256, 259 (3d Cir.1998); *see also* 5A Charles A. Wright & Arther R. Miller, *Federal Practice & Procedure* § 1357 at 299 (2d ed.1990).

### B. Whether Demand is Excused

Plaintiff claims that his failure to ask the directors of Cendant to bring this suit is excused because such demand would have been futile. Plaintiff contends that the directors are self-interested and lack independence and that "their illegal, self-dealing acts are not protected by the business judgment rule." (Pl.'s Mem. at 4.) The HFS defendants, the CUC defendants, Bear Stearns, and the nominal defendant Cendant argue that plaintiff has failed to adequately plead demand futility.

A derivative suit allows an individual shareholder to bring a suit to "enforce a corporate cause of action against officers, directors, and third parties." *Ross v. Bernhard*, 396 U.S. 531, 534, 90 S.Ct. 733, 736, 24 L.Ed.2d 729 (1970). The purpose of such an action is "to place in the hands of the individual shareholder a means to protect the interests of the corporation from the misfeasance and malfeasance of 'faithless directors and managers.'" *Kamen v. Kemper Financial Services, Inc.*, 500 U.S. 90, 95, 111 S.Ct. 1711, 1716, 114 L.Ed.2d 152 (1991) (quoting *Cohen v. Beneficial Loan Corp.*, 337 U.S. 541, 548, 69 S.Ct. 1221, 1226, 93 L.Ed. 1528 (1949)). "To prevent abuse of this remedy, however, equity courts established as a precondition 'for the suit' that the shareholder demonstrate 'that the corporation itself had refused to proceed after suitable demand, unless excused by extraordinary conditions.'" *Kamen*, 500 U.S. at 96, 111 S.Ct. at 1716 (citing *Ross*, 396 U.S. at 534, 90 S.Ct. at 736).

Federal Rule of Civil Procedure 23.1 requires that a derivative complaint "allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and, if necessary, from the shareholders or members, and the reason for the plaintiff's failure to obtain the action or for not making the effort." Fed.R.Civ.P. 23.1. The Supreme Court in *Kamen* wrote that Rule 23.1 "does not create a demand requirement of any particular dimension." 500 U.S. at 96, 111 S.Ct. at 1716. Rather, "the substantive requirements of demand are a matter of state law." *Blasband v. Rales*, 971 F.2d 1034, 1046 (3d Cir.1992) (citing *Kamen*,

500 U.S. at 96, 111 S.Ct. at 1716). Because Cendant is a Delaware corporation, Delaware law governs the substantive requirements of Deutch's claims, including the demand requirement.

■■■ Under Delaware law, "the decision to bring a lawsuit or to refrain from litigating a claim on behalf of the corporation is a decision concerning the management of the corporation and consequently is the responsibility of the directors." *Blasband*, 971 F.2d at 1047 (citing *Levine v. Smith*, 591 A.2d 194, 200 (Del.1991); *Spiegel v. Buntrock*, 571 A.2d 767, 773 (Del.1990)). Because "the derivative action impinges on the managerial freedom of directors," the demand requirement "exists at the threshold, first to insure that a stockholder exhausts his intracorporate remedies, and then to provide a safeguard against strike suits." *Aronson v. Lewis*, 473 A.2d 805, 811–812 (Del.1984); *Blasband*, 971 F.2d at 1048. Demand may be excused if it would be futile. In *Aronson*, the Delaware Supreme Court defined a two-part test to evaluate a claim of demand futility. *Aronson*, 473 A.2d at 814. As restated by the Delaware Supreme Court in *Levine*,

> [i]n determining the sufficiency of a complaint to withstand demand futility ... [t]he trial court is confronted with two related but distinct questions: (1) whether threshold presumptions of director disinterest or independence are rebutted by well-pleaded facts; and, if not, (2) whether the complaint pleads particularized facts sufficient to create a reasonable doubt that the challenged transaction was the product of a valid exercise of business judgment.

*Levine*, 591 A.2d at 205; *Aronson*, 473 A.2d at 814; *Blasband*, 971 F.2d at 1048. The entire review is factual in nature, and in order for demand to be excused, the trial court "must be satisfied that a plaintiff has alleged facts with particularity which, taken as true, support a reasonable doubt" as to a director's interest or independence or that the challenged transaction was the product of a valid exercise of business judgment. *Aronson*, 473 A.2d at 814; *Rales v. Blasband*, 634 A.2d 927, 936 (Del.1993). In its determination, the trial court must not rely on any one factor but examine the totality of the circumstances and consider all of the relevant factors. *Harris v. Carter*, 582 A.2d 222, 229 (Del.Ch.1990).

### 1. Whether Plaintiff Has Rebutted the Presumption of Director Disinterest and Independence

■■■ "Under the first prong of the *Aronson* test, the court reviews the factual allegations of the complaint to determine whether they create a reasonable doubt as to the disinterestedness and independence of the directors at the time the complaint was filed." *Blasband*, 971 F.2d at 1048 (citing *Pogostin v. Rice*, 480 A.2d 619, 624 (Del. 1984); *Aronson*, 473 A.2d at 814). If the transaction at issue is an "'interested' director transaction, such that the business judgment rule is inapplicable to the board majority approving the transaction, then the inquiry ceases." *Aronson*, 473 A.2d at 815. "Directorial interest exists whenever divided loyalties are present, or where the director stands to receive a personal benefit from the transaction not equally shared by the shareholders." *Blasband*, 971 F.2d at 1048 (citing *Pogostin*, 480 A.2d at 624). A director is also interested when a corporate decision will have a materially detrimental impact on a director. *Rales*, 634 A.2d at 936. Directorial independence requires a director's decision to be "based on the corporate merits of the subject before the board rather than extraneous considerations or influences." *Aronson*, 473 A.2d at 816; *Blasband*, 971 F.2d at 1048.

Plaintiff argues that "a majority of the Board has disqualifying self-interests because they benefitted from the alleged wrongdoing." (Pl.'s Mem. at 22.) He claims that:

> the Director Defendants received enormous benefits, worth hundreds of millions of dollars, by causing Cendant to issue false and misleading statements regarding, *inter alia*, Cendant's financial condition and the scope of the pre-Merger due diligence. These false statements enabled the Director Defendants to successfully complete the Merger, which in turn enabled the Defendants to receive lucrative compensation packages, fees, and stock options.

(Id. at 22–23.) "[T]hese self-interested Director Defendants delegated complete and utter authority regarding this suit to a Litigation Committee" before they moved to dismiss the complaint. (Id. at 23.) Plaintiff alleges that this Litigation Committee was a sham, and that the Director Defendants delegated to it "control over any claims [Cendant] may have against them, including the claims asserted in this action." (Id. at 3.) According to him, the Director Defendants' establishment of this Litigation Committee was an admission that a majority of the board had a disqualifying self-interest and evidence that demand was futile. (Pl.'s Mem. at 21–22.)

Defendants argue that for each challenged transaction, a majority of the board was not "interested." Plaintiff contends that the transactions should not be evaluated individually to determine whether a majority of the directors was "interested." Rather, the Court should determine whether a majority of the directors was interested with respect to the challenged transactions as a whole. The wrongful acts of the directors, according to plaintiff, "are inextricably interwoven[,] emanated from a common factual nucleus (e.g., the conscious or reckless disregard of the accounting transgressions and operational chaos at CUC)[,] and shared a common purpose and effect (to greatly enrich the Director Defendants)." (Pl.'s Mem. at 26.) Plaintiff asserts that each of the directors engaged in some or all of the following wrongful acts:

(1) they engaged in insider trading (AC ¶¶ 5, 10, 18, 68, 77, 81, 175–181)(2) they were responsible for disseminating the misleading statements; (AC ¶¶ 5, 10, 11, 18, 20–21, 63–69, 77, 79, 83, 88–92, 95–98)(3) they caused the Company to violate securities laws and exposed the Corporation to liability; (AC ¶¶ 5, 10, 11, 18, 20–21, 63–69, 77, 79, 83, 88–92, 95–98)(4) they breached their managerial duties by allowing the misleading statements to be disseminated; (AC ¶¶ 23, 27, 83, 191–196)(5) they are financially responsible to the Company for the damages caused by their breaches of duty; (AC ¶¶ 18(a)–(p), 27, 175–201)(6) they have entangled financial interests; (AC ¶¶ 18(a)–(p)) and/or (7) they

are beholden to Silverman and Forbes, and would be reluctant to sue them. (AC ¶¶ 18(a)–(p), 38, 41–42).

(Pl.'s Mem. at 28.)

The complaint names sixteen of Cendant's twenty-eight directors as defendants. In order for demand to be excused, the complaint must create a reasonable doubt of the disinterestedness or independence of at least fifteen directors at the time the complaint was filed (April 27, 1998). The complaint does so.

Plaintiff has satisfied the *Aronson* test. Although defendants' establishment of the Litigation Committee was not an automatic admission of self-interest and waiver of the demand requirement, *see Seminaris v. Landa*, 662 A.2d 1350, 1352 (Del.Ch.1995), plaintiff has created a reasonable doubt as to the disinterestedness of the directors at the time the complaint was filed. Each of the sixteen Director Defendants is interested because he is a defendant in other pending class action suits arising out of the accounting irregularities and faces significant personal liability for the wrongdoing alleged in the complaint. Plaintiff has claimed that eight of the Director Defendants benefitted from the Merger by special compensation packages or the grant of significant fees (defendant Rosenwald is interested because of his affiliation with Bear Stearns which advised on the Merger and received a $30 million fee). In addition, plaintiff has alleged that ten of the directors sold approximately 4 million shares of stock while in the possession of materially adverse, insider information. Plaintiff has claimed that the directors knew or recklessly disregarded the existence of the accounting irregularities. He has also plead that each of the Director Defendants signed, approved, and published the false statements included in the Joint Merger Proxy, the February 4, 1998 earnings release, the ABI Proxy, the Prides Prospectus, and the 1997 10–K, and that they received personal benefits through these false statements. Because plaintiff has created a reasonable doubt as to the disinterestedness of the directors, demand would have been futile and is excused. Defendants' motions to dismiss the complaint for failure

to make a demand or adequately plead demand futility is denied.

## C. Insider Trading Claims

### 1. Failure to State a Claim

The HFS defendants and E. Kirk Shelton argue that the complaint fails to state an insider trading claim against them. The HFS defendants contend that New Jersey law applies to plaintiff's insider trading claim because it is based on the tort of conversion which allegedly occurred in New Jersey. (HFS Defs.' Reply at 12.) The HFS defendants contend that plaintiff has failed to state a claim for relief under New Jersey law. E. Kirk Shelton asserts that the complaint has failed to allege that he engaged in insider trading. Plaintiff responds that Delaware law applies to the insider trading claim, but that even under New Jersey law, he has stated a claim for insider trading.

#### a. The HFS Defendants

■■■■ The disagreement between plaintiff and the HFS defendants over which state's laws apply to the insider trading claim presents a choice of law issue only if the laws of the two states differ. To determine whether a choice of law issue exists, the Court must first ascertain whether there is a conflict between the insider trading laws of New Jersey and Delaware. *Oil Shipping B.V. v. Sonmez Denizcilik Ve Ticaret A.S.*, 10 F.3d 1015, 1018 (3d Cir.1993). Both Delaware and New Jersey recognize a common law cause of action for a derivative plaintiff against a corporate officer who has traded stock of the corporation on the basis of inside information. *Davidge v. White*, 377 F.Supp. 1084, 1089 (S.D.N.Y.1974) (applying Delaware law) ("as long as the information upon which the defendant, as former insider, is trading, remains confidential or undisclosed to the public, the defendant, as we read Delaware law, has a duty not to personally profit from this information"); *Brophy v. Cities Service Co.*, 31 Del.Ch. 241, 246–247, 70 A.2d 5, 8 (1949) (when "a person in a confidential or fiduciary position, in breach of his duty, uses his knowledge to make a profit for himself, he is accountable for such profit...."); *Frankel v. Slotkin*, 984 F.2d 1328,

1336–1337 (2d Cir.1993) (applying New Jersey law); *National Westminster Bancorp NJ v. Leone*, 702 F.Supp. 1132, 1139 (D.N.J. 1988) (recognizing a "common law cause of action by the corporation against a corporate director for profits gained from trading on inside information"); *In re ORFA Securities Litig.*, 654 F.Supp. 1449, 1456 (D.N.J.1987) ("a corporate director may not exploit inside information for personal gain"). Under the laws of both states, directors who trade stock on the basis of inside information violate their fiduciary obligations to the corporation. *Brophy*, 31 Del.Ch. at 246–247, 70 A.2d at 8; *ORFA*, 654 F.Supp. at 1456–1457. To state a claim for breach of fiduciary duty, a plaintiff must show a duty, a breach of that duty, an injury and causation. *ORFA*, 654 F.Supp. at 1457. Because the laws of Delaware and New Jersey are in accord with regard to a common law claim of insider trading, there is no choice of law issue.

■■■■ Plaintiff has stated a claim against the HFS defendants for insider trading under the laws of both Delaware and New Jersey. He has alleged that the Director Defendants occupied fiduciary positions, owed Cendant a duty, breached that duty through their use of inside knowledge of Cendant's true financial condition to sell millions of shares of stock for their own personal gain to the detriment of Cendant. At this stage of the litigation, "it is not necessary to speculate ... whether plaintiff will be able to prove harm" to the corporation. *ORFA*, 654 F.Supp. at 1457. For the purposes of this motion, it is enough that plaintiff has plead the elements of an insider trading claim against the HFS defendants. The motion of the HFS defendant to dismiss Count I of the complaint is denied.

#### b. E. Kirk Shelton and Cosmo Corigliano

Defendant Shelton argues that plaintiff "has not even attempted to set forth a factual basis" for the insider trading claim against him. Count I of the complaint is a "derivative action for breach of fiduciary duty against the individual defendants for insider selling and misappropriation of corporate information." (Am. Compl. at 67.) Although

plaintiff brings this count against all the individual defendants, the count lists the defendants who allegedly sold their stock while in the possession of material, adverse inside information; Shelton was not among them. Nor was defendant Corigliano who adopts this argument.

There is merit to Shelton's argument. The complaint contains no factual allegations that either he or Corigliano traded in Cendant securities while in the possession of material inside information about the company. Count I of the complaint is dismissed against defendants Shelton and Corigliano.

### 2. Failure to Plead Fraud with Particularity

The HFS defendants argue that the complaint fails to plead fraud with particularity with regard to the insider trading claim. In particular, these defendants assert that plaintiff has not adequately alleged that Silverman, Buckman, Snodgrass, and Edelman were aware of the CUC accounting irregularities at the time they sold Cendant stock. There is no merit to this claim.

Fed.R.Civ.P. 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." "The purpose of Rule 9(b) is to provide notice of the 'precise misconduct' with which defendants are charged" in order to give them an opportunity to respond meaningfully to a complaint, "and to prevent false or unsubstantiated charges." *Rolo v. City Investing Co. Liquidating Trust*, 155 F.3d 644, 658 (3d Cir.1998). To satisfy Rule 9(b), a plaintiff must "plead with particularity the 'circumstances' of the alleged fraud." *Rolo*, 155 F.3d at 658. Rule 9(b) "requires plaintiffs to plead 'the who, what, when, where, and how: the first paragraph of any newspaper story.'" *In re Advanta Corp. Sec. Lit.*, 180 F.3d 525, 534 (3d Cir.1999) (quoting *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990)). Plaintiffs need not, however, plead the 'date, place or time' of the fraud, so long as they use an 'alternative means of injecting precision and some measure of substantiation

into their allegations of fraud.'" *Rolo*, 155 F.3d at 658 (citing *Seville Indus. Machinery v. Southmost Machinery*, 742 F.2d 786, 791 (3d Cir.1984)). Our Circuit has cautioned that courts should "apply the rule with some flexibility and should not require plaintiffs to plead issues that may have been concealed by the defendants." *Rolo*, 155 F.3d at 658 (citing *Christidis v. First Pennsylvania Mortg. Trust*, 717 F.2d 96, 99 (3d Cir.1983)).

The complaint alleges that "[a]t the time of their stock sales, defendants Silverman, Forbes, Donnelley, Edelman, Rumbough, Snodgrass, Burnap, Buckman, McLeod, and Perfit knew, or recklessly closed their eyes to the fact, that [Cendant's] publicly reported earnings were inflated by 'accounting errors', which, when exposed, would cause the inflated price of Cendant's shares to come tumbling down." (Am. Compl. ¶ 187.) Plaintiff's complaint details when the defendants sold their shares and when they and Cendant became aware of the accounting irregularities. With regard to defendants Silverman, Buckman, Snodgrass, and Edelman, the complaint recites that Silverman sold 1.7 million shares on February 5–6, 1998; that Buckman sold 300,000 shares on February 6, 1998; that between February 25, 1998 and March 17, 1998, Edelman sold 60,000 shares and Snodgrass sold 811,423 shares; and that on April 6–7, 1998, Snodgrass sold 793,026 shares. (Am.Compl. ¶¶ 18, 68, 77, 81.) The complaint avers that on February 3, 1998, Cendant's Audit Committee learned of a $23 million overstatement in CUC's income for January, 1997. (Id. at ¶ 63.) On March 6 and 7, 1998, Cendant's Chief Accounting Officer, Scott Forbes, and Silverman were told of inappropriate accounting adjustments, and on March 9, 1998, Silverman had a meeting with certain HFS defendants to discuss these accounting improprieties. (Id. at ¶¶ 72–75.) The timing of defendants' stock sales in relation to these events, alone, raises a strong inference of scienter. Plaintiff has plead fraud with particularity in the insider trading claim. The motion of the HFS defendants to dismiss Count I is denied.

## D. Counts II and III—Breach of Fiduciary Duty and Gross Negligence

### 1. Whether Plaintiff's Claims Are Barred by the Certificate of Incorporation

■ The HFS and CUC defendants argue that Counts II and III of the complaint against them should be dismissed because they are based an alleged duty of care and Cendant's certificate of incorporation bars duty of care claims. Plaintiff contends that these counts are based not only on defendants' breach of their duty of care but also on breaches of their fiduciary duty of loyalty, intentional misconduct, acts not in good faith, and transactions in which they received improper personal benefit. These claims, according to plaintiff, are not barred by the certificate of incorporation.

Pursuant to § 102(b)(7) of Delaware's General Corporation Law, a certificate of incorporation may contain:

A provision eliminating or limiting the personal liability of a director to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, provided that such provision shall not eliminate or limit the liability of a director: (i) For any breach of the director's duty of loyalty to the corporation or its stockholders; (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law; (iii) under § 174 of this title; or (iv) for any transaction from which the director derived an improper personal benefit.

8 Del. C. § 102(b)(7). Section 174 of Delaware's General Corporation Law treats the liability of directors for an unlawful payment of dividends, stock purchase, or stock redemption. 8 Del. C. § 174. Article 11 of Cendant's certificate of incorporation contains such a limitation of liability and mirrors the language of § 102(b)(7):

No director of the Corporation shall be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty by such director as a director; provided, however, that this Article 11 shall not eliminate or limit the

liability of a director to the extent provided by applicable law (i) for any breach of the director's duty of loyalty to the corporation or its stockholders, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (iii) under section 174 of the General Corporation law of the State of Delaware, or (iv) for any transaction from which the director derived an improper personal benefit.

The HFS and CUC defendants argue that although Counts II and III of plaintiff's complaint purport to be based on breaches of the fiduciary duty of loyalty and good faith, they are really non-actionable claims for breaches of the duty of care.

Count II·alleges that each of the individual defendants "committed one or more of the acts or omissions to act, which constituted waste of corporate assets, mismanagement, gross negligence and violations of their fiduciary duties. As a direct and proximate result of individual defendants' breaches of fiduciary duty of loyalty, good faith, and to exercise due care as alleged herein, Cendant has engaged in imprudent and unlawful activities...." (Am.Compl. ¶¶ 192–193.) Count III alleges that each of the individual defendants "committed one or more acts of gross negligence in the conduct of the Company's business ..., [that they] as officers and/or directors of Cendant, owed Cendant duties of care and loyalty in the performance of their duties. Each Individual Defendant breached his duties of care and loyalty to Cendant by acting in a grossly negligent fashion in the performance of such duties." (Id. at ¶ 198.) Plaintiff contends that the wrongful acts referred to in these Counts were "committed in furtherance of a pattern of self-dealing, the purpose and effect of which was to improperly benefit the Director Defendants at the expense of the Company to which these Defendants owed an undivided duty of loyalty." (Pl.'s Mem. at 50–51.) Defendants' alleged misdeeds include: "(a) knowingly issuing false financial statements; (b) improperly benefitting themselves at the expense of the Company at the time of the Merger; (c) engaging in insider trading to line their own pockets; (d) creating a sham Litigation Com-

mittee to protect themselves from liability; and (e) wasting corporate assets." (Id. at 51.)

Plaintiff's claims in Counts II and III are not barred by Cendant's certificate of incorporation. By his factual allegations, plaintiff has plead that the individual defendants breached their fiduciary duty of loyalty, acted in bad faith, knowingly, and intentionally in their malfeasance, and derived improper benefits from their missteps at Cendant's expense. The complaint asserts that defendants knew that the 1997 financial statement and annual statement were false at the time they were issued. Plaintiff has charged that the defendants consummated the Merger for their own benefit. The motions of the HFS and CUC defendants to dismiss Counts II and III because barred by the certificate of incorporation are denied.

### 2. Whether Plaintiff Has Failed to State a Claim in Counts II and III Against E. Kirk Shelton and Cosmo Corigliano

Defendants Shelton and Corigliano argue that the complaint has failed to state a claim against them in Count II or III for either breach of fiduciary duty or gross negligence. Shelton claims that Cendant's certificate of incorporation bars these claims against him and the complaint's assertions fail to establish that he breached his fiduciary duty or acted negligently. Plaintiff answers that the certificate of incorporation does not bar these claims and that the complaint's allegations specify a breach of loyalty claim against Shelton and Corigliano because they "materially benefitted from the Merger while ... they caused the Company (and CUC) to publish various public statements which they knew or were reckless in not knowing were false and misleading." (Pl.'s Mem. at 59.)

As discussed, Cendant's certificate of incorporation does not bar the claims in Counts II and III of the complaint because these counts are based on plead breaches of the fiduciary duty of loyalty, knowing and intentional misdeeds and bad faith acts for personal gain. The complaint alleges that Shelton breached his fiduciary duty of loyalty

because he approved the Merger for his own benefit (as part of the Merger, he received options to purchase 1.8 million shares of Cendant common stock) and to the detriment of the Company. (Am.Compl. ¶ 18(n).) Against Corigliano, the complaint alleges that he "directed adjustments to increase CUC's quarterly income and knew about or directly participated in other accounting irregularities at CUC." (Am.Compl. ¶ 18(q).) Plaintiff has plead that Corigliano violated his duty of loyalty to the Company because he knowingly participated in CUC's accounting irregularities in order to increase Cendant's short-term publicly reported earnings and maximize the value of his own holdings in the Company, including $1.35 million worth of stock options granted to him from the Merger. (Am.Compl. ¶¶ 18(q) and 23.) As to charges of gross negligence, the complaint avers that all the individual defendants, including Shelton and Corigliano so acted in the performance of their duties of care and loyalty to Cendant. Because plaintiff has adequately plead that both Shelton and Corigliano breached their fiduciary duties and were grossly negligent in the exercise of their duties, their motions to dismiss Counts II and III are denied.

### E. Cendant Has Released Forbes from Liability for Certain Claims

The CUC defendants move to dismiss the complaint against defendant Forbes because, they maintain, Cendant has released Forbes from liability for all the claims in the complaint. On July 28, 1998, Cendant agreed to release Forbes from liability for claims based upon accounting issues:

The Company covenants that it will not bring or assert against the Executive any claim or cause of action, whether in law or equity, based upon any of the Accounting Issues and hereby releases the Executive from any and all claims, causes of action, debts, contracts, promises and demands, whether in law or equity, based upon the Accounting Issues, except as expressly set forth in this Agreement; provided however, that this Section 2 shall in all respects be null, void and of no effect if the Executive is convicted of or pleads guilty to any

crime based upon any of the Accounting Issues.

(July 29, 1998 Form 8–K at Ex. 10.2.) The CUC defendants argue that because Cendant has released Forbes from liability for claims based upon accounting issues, a shareholder cannot bring a derivative suit on Cendant's behalf based upon these claims. The CUC defendants maintain that all the claims against Forbes in the complaint are based upon accounting issues. Plaintiff did not oppose this motion. However, the insider trading claim in Count I, though it relates to Forbes' knowledge of the accounting irregularities, is not "based" upon accounting issues. Counts II and III are based upon accounting issues. Those counts, Counts II and III, are dismissed against defendant Forbes.

### F. Not All of the CUC Directors Were on Cendant's Board at the Relevant Time

■ The CUC defendants argue that certain claims against certain directors should be dismissed because they were not on Cendant's board at the relevant time and did not make the challenged decisions. In particular, defendants assert that plaintiff's claim against Tucker with regard to the HFS Merger into CUC should be dismissed because he was not a director of HFS or CUC before the Merger. They maintain that plaintiff's claims against Burnap, Donnelley, Forbes, Perfit, Rumbough, and Tucker arising from the September, 1998 repricing of stock options should be dismissed because those directors had resigned from Cendant's board on July 28, 1998. The CUC defendants further argue that the claim against McLeod about the decision to reprice stock options should be dismissed because he was not on the Compensation Committee and not involved in that decision.

The "claims" to which the CUC defendants refer are only allegations found in the complaint; none of them is a count or a cause of action unto itself. Because none of the three counts of plaintiff's complaint is based solely on any of the above allegations, the CUC defendants' motion to dismiss these "claims," these allegations, is denied.

### G. Failure to Set Forth a Cognizable Theory of Damages

■ Defendant Shelton argues that plaintiff has not set forth a cognizable theory of damages. Plaintiff has alleged that the misdeeds of the individual defendants have exposed and will continue to expose Cendant to enormous legal liability and costs, have caused Cendant to incur "well over $500 million in out-of-pocket costs" including the $400 million fee for the termination of the ABI merger and $100 million for the Audit Committee Investigation and severance package for Forbes, with damage to Cendant's credit ratings, reputation and credibility. Plaintiff further charges that these misdeeds have rendered Cendant's financial statements unreliable and have damaged the corporation's ability to use stock to acquire additional prospects with the internal controls and stability of its operations now suspect.

Defendant Shelton contends that the claim for potential liability and costs is premature and should be dismissed because it violates the "case and controversy" requirement of Article III of the Constitution. Shelton argues that plaintiff's quest for damages for purported harm to Cendant's reputation and credibility should be dismissed because it relies on speculative and conclusory allegations. As to the break-up fee for the ABI merger, Shelton argues that he had long since resigned from Cendant at the time the decision was made to pay the fee. Shelton argues that he cannot be held accountable for that fee because of the April 15, 1998 disclosure of accounting irregularities since the complaint does not allege that the accounting irregularities rendered Cendant unable to complete the ABI merger.

■ Plaintiff has set forth a cognizable theory of damages. In support of his argument, Shelton relies on *In re Symbol Technologies Secs. Litig.*, 762 F.Supp. 510 (E.D.N.Y.1991), a derivative action brought against the Symbol Technologies' officers and directors for a variety of claims, including securities laws violations. There, plaintiff sought damages for legal fees and any payment Symbol Technologies might make to resolve claims asserted against it in a pend-

ing class action suit. The court found that plaintiff's damage claim "hinge[d] entirely on the outcome of another pending action," and concluded that plaintiff's cause of action was "more appropriately treated as an action for indemnification, which ha[d] not yet accrued." 762 F.Supp. at 516–517. Here, unlike *Symbol Technologies,* Cendant has already incurred legal expenses and issued almost $350 million in securities to settle the Prides litigation. Also, Cendant incurred costs from the Audit Committee Investigation, the severance package for Forbes, and the break-up fee for the ABI acquisition. That Shelton was not on the board at the time the decision was made to pay the break-up fee is of no moment. He was on the board at the time the decision was made to engage in the ABI acquisition and at the time the false and misleading statements were filed with the SEC in connection with that acquisition. Shelton's argument that plaintiff cannot now recover for damage to Cendant's reputation also fails. Damage to one's business and reputation is a cognizable injury for which damages may be awarded if the underlying charges are proved. Shelton's motion to dismiss plaintiff's claims for damages is denied.

## H. Whether This Court Lacks Personal Jurisdiction over Amy Lipton

Defendant Amy Lipton insists that this Court lacks personal jurisdiction over her. She was CUC's Senior Vice President and General Counsel, and after the Merger, became Executive Vice President and Deputy General Counsel of Cendant. (Am.Compl. ¶ 18(r).) Lipton claims that she is a long-time resident of Connecticut, who from 1987 until December, 1997, worked exclusively in CUC's Stamford, Connecticut office. (Lipton Mem. at 3.) She states that she has never lived in New Jersey, owns no property or business and maintains no bank accounts in this state. (Id.) Lipton states that she visits New Jersey socially once or twice a year. (Id.) After the Merger, Lipton continued to work in Cendant's Stamford, Connecticut headquarters. (Id. at 3–4.) She contends that she has never worked at or even visited Cendant's office in Parsippany, New Jersey and has only spoken by telephone or corresponded with that office on a limited basis. (Id. at 4.)

### 1. Applicable Law

Pursuant to Federal Rule of Civil Procedure 4(e), federal "district courts have personal jurisdiction over non-resident defendants to the extent authorized under the law of the forum state in which the district court sits." *See Sunbelt Corp. v. Noble, Denton & Assoc., Inc.,* 5 F.3d 28, 31 (3d Cir.1993). New Jersey's long arm statute provides for personal jurisdiction as far as is permitted by the Fourteenth Amendment to the United States Constitution. *See N.J. Ct. R.* 4:4–4; *Carteret Savings Bank, FA v. Shushan,* 954 F.2d 141, 145 (3d Cir.1992); *DeJames v. Magnificence Carriers, Inc.,* 654 F.2d 280, 284 (3d Cir.1981). Therefore, the question of whether this Court has jurisdiction over the defendant is determined by federal constitutional law. *See Mesalic v. Fiberfloat Corp.,* 897 F.2d 696, 698 (3d Cir.1990).

The Fourteenth Amendment permits a state to exercise jurisdiction over an out-of-state defendant only where "the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475, 105 S.Ct. 2174, 2184, 85 L.Ed.2d 528 (1985) (quoting *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 1239, 2 L.Ed.2d 1283 (1958)). The burden to produce actual evidence of the defendant's contacts with the forum state and to prove that the defendant has purposefully availed herself of the forum state rests on the plaintiff. *Time Share Vacation Club v. Atlantic Resorts, Ltd.,* 735 F.2d 61, 67 (3d Cir.1984); *see Stranahan Gear Co., Inc. v. NL Industries, Inc.,* 800 F.2d 53, 58 (3d Cir.1986)(cursory allegation reiterated in a sworn affidavit is insufficient to satisfy the plaintiff's burden of proof); *see also Burke v. Quartey,* 969 F.Supp. 921, 924 (D.N.J.1997).

To prove that the defendant has purposefully availed herself of the forum, a plaintiff may rely upon a defendant's specific contacts with that state. Personal jurisdiction pursuant to such contacts is known as

specific jurisdiction, which may be invoked when a claim is related to or arises of out the defendant's contacts with the forum. *See Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 416, 104 S.Ct. 1868, 1873, 80 L.Ed.2d 404 (1984); *Dollar Sav. Bank v. First Security Bank of Utah,* 746 F.2d 208, 211 (3d Cir.1984). A court must first determine whether the defendant had the minimum contacts with the forum necessary for the defendant to have "reasonably anticipate[d] being haled into court there." *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980) (citations omitted). What constitutes minimum contacts varies with the "quality and nature of defendant's activity." *Hanson,* 357 U.S. at 253, 78 S.Ct. at 1240. In assessing the sufficiency of minimum contacts for personal jurisdiction, the court must focus on the "relationship among the defendant, the forum and the litigation." *Keeton v. Hustler Magazine,* 465 U.S. 770, 775, 104 S.Ct. 1473, 1478, 79 L.Ed.2d 790 (1984). Otherwise stated, there must be at least "a single deliberate contact" with the forum state that relates to the cause of action. *United States Golf Ass'n v. United States Amateur Golf Ass'n,* 690 F.Supp. 317, 320 (D.N.J.1988). The unilateral acts of the plaintiff, however, will not amount to minimum contacts. *Helicopteros,* 466 U.S. at 414, 104 S.Ct. at 1872; *Hanson,* 357 U.S. at 253, 78 S.Ct. at 1240.

Second, assuming minimum contacts have been established, a court may inquire whether "the assertion of personal jurisdiction would comport with 'fair play and substantial justice.'" *Burger King Corporation v. Rudzewicz,* 471 U.S. 462, 476, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985) (quoting *International Shoe Company v. Washington,* 326 U.S. 310, 320, 66 S.Ct. 154, 90 L.Ed. 95 (1945)); *Pennzoil Products Co. v. Colelli & Assoc., Inc.,* 149 F.3d 197, 201 (3d Cir.1998). For personal jurisdiction to comport with "fair play and substantial justice," it must be reasonable to require the defendant to defend the suit in the forum state. *See World–Wide Volkswagen,* 444 U.S. at 292, 100 S.Ct. at 564. To determine reasonableness, a court considers the following factors: "the burden on the defendant ..., the forum state's interest in adjudicating the dispute ..., the plaintiff's interest in obtaining convenient and effective relief ..., the interstate judicial system's interest in obtaining the most efficient resolution of controversies ..., and the shared interest of the several States in furthering fundamental substantive social policies...." *World–Wide Volkswagen,* 444 U.S. at 292, 100 S.Ct. at 564 (internal cites omitted). Only in "rare cases [do the] minimum requirements inherent in the concept of fair play and substantial justice ... defeat the reasonableness of jurisdiction even [though] the defendant has purposefully engaged in forum activities." *Asahi Metal Industry Co., Ltd. v. Superior Court of Cal., Solano County,* 480 U.S. 102, 116, 107 S.Ct. 1026, 1034, 94 L.Ed.2d 92 (1987) (internal quotation marks omitted).

If the plaintiff cannot establish specific jurisdiction, a court may exercise general jurisdiction over the defendant if the defendant has maintained "continuous and systematic contacts" with the forum state. *Helicopteros,* 466 U.S. at 416, 104 S.Ct. at 1873. To establish general jurisdiction the plaintiff must show significantly more than mere minimum contacts with the forum state. *Provident Nat'l Bank v. California Fed. Sav. & Loan Ass'n,* 819 F.2d 434, 437 (3d Cir. 1987). Moreover, the facts required to establish general jurisdiction must be "extensive and persuasive." *Reliance Steel Prods. v. Watson, Ess, Marshall,* 675 F.2d 587, 589 (3d Cir.1982).

### 2. Whether Plaintiff Has Established that Lipton Has Contacts Sufficient with New Jersey to Establish Personal Jurisdiction

Plaintiff argues that this Court has jurisdiction over Lipton by virtue of her role as a senior executive in the management of a New Jersey based corporation, her participation as CUC's general counsel in the Merger, the significant compensation package she received through the Merger, and her participation in the malfeasance alleged in the complaint. (Pl.'s Mem. at 53.) Plaintiff asserts that Lipton played a prominent role in the day-to-day management of a New

Jersey based company and therefore she "most certainly 'availed [herself] of the privilege of conducting activities within the forum State' and directed her activities at causing harm to a corporation situated within New Jersey." (Id. at 54.) Plaintiff also argues that "it is inconceivable that the deputy general counsel of a New Jersey based company could not 'reasonably anticipate being haled into court there.'" (Id. at 54.) Plaintiff contends that the complaint against Lipton should not be dismissed at this juncture because he has not had an opportunity for discovery or to cross-examine Lipton and the other defendants and witnesses.

Plaintiff has not met his burden. Plaintiff has cited no support for the proposition that this Court has jurisdiction over Lipton by virtue of her position as an officer of a corporation with New Jersey headquarters. He has not shown that Lipton has the type of continuous and systematic contacts necessary for general jurisdiction. Likewise, plaintiff has not demonstrated that the breach of fiduciary duty and gross negligence claims against Lipton arise out of or relate to her conduct in New Jersey for the determination of specific jurisdiction. The complaint against defendant Lipton is dismissed for lack of personal jurisdiction.

### I. Whether Deutch Has Standing to Sue on Behalf of HFS

Bear Stearns argues that Deutch has no standing to sue for alleged injuries to HFS, a corporation in which he does not claim he owned stock and which ceased to exist after the Merger. Plaintiff counters that he brings this suit not on behalf of HFS but Cendant, a corporation in which he does own stock. Moreover, he contends, because HFS was the predecessor corporation to Cendant, such a shareholder, on behalf of Cendant, has standing to sue for injuries to it.

▆▆▆ Under Delaware law, to have standing to bring a derivative suit, a plaintiff must allege that (1) he "was a stockholder of the corporation at the time of the transaction of which he complains or that his stock thereafter devolved upon him by operation of law," 8 Del.Code Ann. § 327, and (2) he has continuously held stock in the corporation at the time of the filing of the suit and throughout the litigation. *Blasband v. Rales,* 971 F.2d 1034, 1040–1041 (3d Cir.1992) (citing *Kramer v. Western Pacific Indus., Inc.,* 546 A.2d 348, 354 (Del.1988); *Lewis v. Anderson,* 477 A.2d 1040, 1046 (Del.1984)). Although Deutch sues on behalf of Cendant, not HFS, and Cendant has standing to sue as the successor corporation to HFS, Deutch has not alleged that he was a shareholder of HFS at the time of the alleged gross negligence by Bear Stearns. Plaintiff claims that the traditional requirements of stock ownership at the time of the alleged wrong and continuity of stock ownership do not apply here. He relies solely on *Blasband,* 971 F.2d 1034, for the proposition that a shareholder of a company (C) formed by the merger of company (A) into company (B) has standing to sue for company (A). However, in *Blasband,* the shareholder of company (C) who sued on behalf of company (A) after the merger had owned stock in company (A). Because plaintiff has not alleged here that he owned HFS stock at the time of the alleged wrongs committed by Bear Stearns, he does not have standing to sue Bear Stearns on behalf of Cendant. The complaint against Bear Stearns is dismissed.

### J. The CUC Defendants' Motion to Stay This Suit Pending the Delaware Action

The CUC defendants have moved to stay this action in deference to *Corwin, et al. v. Silverman, et al.,* 1999 WL 499456, No. Civ.A. 16347 (Del.Ch.1999), a derivative suit brought by other shareholders on behalf of Cendant in the Delaware Chancery Court. That motion is now moot because on June 30, 1999, the Delaware Chancery Court stayed *Corwin* pending the resolution of this action. *Corwin, et al. v. Silverman, et al.,* No. Civ. A. 16347, 1999 WL 499456 (Del.Ch. June 30, 1999).

### IV. Conclusion

The motion of defendants Shelton and Corigliano to dismiss Count I against them is granted. The motion of defendant Bear Stearns to dismiss the complaint against it is granted. Defendant Amy Lipton's motion to dismiss the complaint against her for lack of

personal jurisdiction is granted. The CUC defendant's motion to dismiss Counts II and III against Forbes is granted. All other motions are denied.

SO ORDERED.