In re CRAY INC. Derivative Litigation.

This document relates to All Actions.

No. C05–1016Z.

United States District Court,
W.D. Washington,
at Seattle.

April 28, 2006.

Adam R. Gonnelli, Nadeem Faruqi, Faruqi & Faruqi, New York City, Clifford A. Cantor, Sammamish, WA, John G. Emerson, Emerson Poynter, Seattle, WA, Stuart W. Emmons, W. Todd Ver Weire, William B. Federman, Federman & Sherwood, Oklahoma City, OK, for Plaintiffs.

Alfred Arthur Day, Stoel Rives (WA), Christian N. Oldham, Rudy Albert Englund, Brian J. Meenaghan, Lane Powell PC (SEA), Seattle, WA, Lois Omenn Rosenbaum, Stoel Rives, Portland, OR, for Defendants.

## ORDER

ZILLY, District Judge.

This matter comes before the Court on motions to dismiss by nominal Defendant Cray Incorporated ("Cray") pursuant to FED.R.CIV.P. 12(b)(6) for failure to comply with the pre-litigation demand requirement in RCW 23B.07.400, docket no. 18, and by the Individual Defendants [1] for failure to properly plead fraud pursuant to FED.R.CIV.P. 9(b) and failure to state claims upon which relief can be granted pursuant to FED.R.CIV.P. 12(b)(6), docket no. 16.[2] Having reviewed the motions to dismiss, Plaintiffs' opposition briefs, docket nos. 22 and 23, the reply briefs, docket nos. 25 and 27, and all supporting declarations and exhibits, and having heard argument on March 28, 2006, the Court now enters the following Order.

### BACKGROUND

This shareholder derivative action brings claims for breach of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets, and unjust enrichment. Verified Amended Derivative Complaint ("VADC"), docket no. 9,

---

1. The "Individual Defendants" are James E. Rottsolk, Peter J. Ungaro, David R. Kieffer, Scott J. Poteracki, Kenneth W. Johnson, Burton J. Smith, Kenneth W. Kennedy, Jr., Stephen C. Kiely, Daniel C. Regis, Sally G. Narodick, Frank L. Lederman, John B. Jones, Jr., and Stephen C. Richards.

2. In their motion to dismiss, the Individual Defendants join in Cray's motion to dismiss for failure to comply with the demand requirement. Docket no. 18, at 1.

¶ 1. Plaintiffs allege that these violations occurred from July 31, 2003, to the filing of the VADC on October 13, 2005 ("Relevant Period"). *Id.* ¶ 1. Plaintiffs are shareholders of Cray who owned, and continue to own, shares of Cray's common stock. *Id.* ¶¶ 11–12.

As alleged by Plaintiffs, "Cray is engaged in the design, development, marketing and support of high-performance computer systems, commonly known as supercomputers." *Id.* ¶ 2. Cray is incorporated and maintains its principal place of business in Washington State. *Id.* ¶ 13. Generally, Plaintiffs allege that Cray's officers and directors "knowingly misrepresented both the dynamics of Cray's business model and the Company's internal controls with regard to its financial reporting process." *Id.* ¶ 3. More specifically, Plaintiffs allege that "[o]n March 16, 2005, Cray revealed that, commensurate with its Sarbanes–Oxley activities, it expected to document material weaknesses in its system of internal controls and also expected to report that these controls were ineffective." *Id.* ¶ 5. As a result, Plaintiffs allege that on March 17, 2005, Cray's stock lost 25.9% of its value. *Id.* Finally, Plaintiffs allege that on May 9, 2005, Cray publicly revealed that it failed to include an auditor's opinion on management's assessment of internal control over financial reporting, and Cray reported revenue results that were adversely impacted by faulty internal controls and practices causing Cray's stock to drop another 35.6% by May 12, 2005. *Id.* ¶ 6.

Cray has a nine member Board of Directors. The Individual Defendants serving on the Board of Directors include Rottsolk, Smith, Kennedy, Kiely, Regis, Narodick, Richards, Lederman, and Jones. Plaintiffs bring claims against each member of Cray's Board for conduct during the Relevant Period. VADC ¶ 1. Plaintiffs also bring claims against Ungaro, Kiefer, Poteracki, and Johnson in their capacity as officers of Cray. VADC ¶¶ 16–19. Facts relevant to the Individual Defendants are as follows:

### Rottsolk

Rottsolk is the Chairman and CEO of Cray and has been a member of the Board of Directors since Cray was founded in 1987. Rottsolk also served as Cray's President from March 2002 until March 7, 2005. Plaintiffs allege that Rottsolk knew of Cray's adverse nonpublic information from internal documents and conversations with others and participated in the issuance of false or misleading statements. During the Relevant Period, Rottsolk sold 79,980 shares of Cray stock for proceeds of $960,710. *Id.* ¶¶ 14, 119(a).

### Smith

Smith is a member of the Board of Directors and an employee of Cray. *Id.* ¶¶ 14, 119(d). Plaintiffs allege that Smith knew of Cray's adverse non-public information from internal documents and conversations with others and participated in the issuance of false or misleading statements. During the Relevant Period, Smith sold 49,548 shares of Cray stock for proceeds of $539,052. *Id.* ¶ 15.

### Kennedy

Kennedy is a member of Cray's Board of Directors. Plaintiffs allege that Kennedy knew of Cray's adverse non-public information from internal documents and conversations with others and participated in the issuance of false or misleading statements. During the Relevant Period, Kennedy sold 900 shares of Cray stock for proceeds of $10,404. *Id.* ¶ 20. *Kiely*

### Kiely

Kiely is a member of Cray's Board of Directors. Plaintiffs allege that Kiely knew of Cray's adverse non-public information from internal documents and conversations with others and participated in

the issuance of false or misleading statements. *Id.* ¶ 21.

*Regis*

Regis is a member of Cray's Board of Directors. Plaintiffs allege that Regis knew of Cray's adverse non-public information from internal documents and conversations with others and participated in the issuance of false or misleading statements. During the Relevant Period, Regis sold 31,999 shares of Cray stock for proceeds of $212,185. *Id.* ¶¶ 22, 115.

*Narodick*

Narodick is a member of Cray's Board of Directors. Plaintiffs allege that Narodick knew of Cray's adverse non-public information from internal documents and conversations with others and participated in the issuance of false or misleading statements. *Id.* ¶ 23.

*Richards*

Richards is a member of Cray's Board of Directors. Plaintiffs allege that Richards knew of Cray's adverse non-public information from internal documents and conversations with others and participated in the issuance of false or misleading statements. *Id.* ¶ 24.

*Lederman*

Lederman is a member of Cray's Board of Directors. Plaintiffs allege that Lederman knew of Cray's adverse non-public information from internal documents and conversations with others and participated in the issuance of false or misleading statements. *Id.* ¶ 25.

*Jones*

Jones is a member of Cray's Board of Directors. Plaintiffs allege that Jones knew of Cray's adverse non-public information from internal documents and conversations with others and participated in the issuance of false or misleading statements. *Id.* ¶ 26.

*Ungaro*

Ungaro was President of Cray during the Relevant Period. Plaintiffs allege that Ungaro knew of Cray's adverse non-public information from internal documents and conversations with others and participated in the issuance of false or misleading statements. *Id.* ¶ 16.

*Kiefer*

Kiefer was Sr. Vice President of Cray at times during the Relevant Period. Plaintiffs allege that Kiefer knew of Cray's adverse non-public information from internal documents and conversations with others and participated in the issuance of false or misleading statements. *Id.* ¶ 17.

*Poteracki*

Poteracki was Sr. Vice President of Finance and Chief Financial Officer of Cray at times during the Relevant Period. Plaintiffs allege that Poteracki knew of Cray's adverse non-public information from internal documents and conversations with others and participated in the issuance of false or misleading statements. *Id.* ¶ 18.

*Johnson*

Johnson was General Counsel, Secretary, and CFO of Cray at times during the Relevant Period. Plaintiffs allege that Johnson knew of Cray's adverse non-public information from internal documents and conversations with others and participated in the issuance of false or misleading statements. *Id.* ¶ 19.

**DISCUSSION**

**I.** *Cray's Motion to Dismiss for Failure to Comply with the Demand Requirement*

**A. Legal Standards**

**1. Motion to Dismiss**

As with all motions to dismiss, allegations of material fact are taken as true and construed in the light most favorable to

the nonmoving party. *Smith v. Jackson,* 84 F.3d 1213, 1217 (9th Cir.1996). However, conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss. *Associated Gen. Contractors v. Metro. Water Dist. of So. Cal.,* 159 F.3d 1178, 1181 (9th Cir.1998).

## 2. Governing Law for Shareholder Demand Requirement

Shareholder derivative actions must comply with FED.R.CIV.P. 23. 1, which states in relevant part as follows: "The complaint shall also allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority . . . and the reasons for the plaintiff's failure to obtain the action or for not making the effort." Rule 23.1 is related to the substantive requirement that plaintiffs in shareholder derivative suits must first demand that the corporation take the action that the plaintiffs seek to enforce through the suit. *See Kamen v. Kemper Fin. Servs.,* 500 U.S. 90, 96, 111 S.Ct. 1711, 114 L.Ed.2d 152 (1991) (Rule 23.1 "clearly contemplates both the demand requirement and the possibility that demand may be excused, [but] it does not create a demand requirement of any particular dimension.").

Because the substantive demand requirement is established by state law, courts must apply the law of the forum state—in this case, Washington State. *See Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Washington State sets forth its own procedural demand requirement for shareholder derivative actions in RCW 23B.07.400(2), which provides as follows:

A complaint in a proceeding brought in the right of a corporation must be verified and *allege with particularity the demand made, if any, to obtain action by the board of directors and either that the demand was refused or ignored or why a demand was not made.* Whether or not a demand for action was made, if the corporation commences an investigation of the charges made in the demand or complaint, the court may stay any proceeding until the investigation is completed.

(Emphasis added).

■ The parties in this case agree that Washington State courts have not interpreted or applied this *procedural* demand requirement, nor have they specifically adopted an underlying *substantive* demand requirement. As a result, both parties rely heavily on case law from other jurisdictions, including the relatively well-developed body of law from Delaware.[3] The "substantive" demand requirement for Delaware is found in Delaware's common law. "[T]he right of a stockholder to prosecute a derivative suit is limited to situations where the stockholder has demanded that the directors pursue the corporate claim and they have wrongfully refused to do so or where demand is excused because the directors are incapable of making an impartial decision regarding such litigation." *Rales v. Blasband,* 634 A.2d 927, 932 (Del. 1993) (noting the connection between this substantive requirement and the procedural requirement in Chancery Court Rule 23.1). The underlying purpose of this requirement is based on the fundamental principle that the "directors of a corporation and not its shareholders manage the

---

**3.** Delaware has adopted a procedural demand requirement, which is found in Delaware Chancery Court Rule 23. 1, as follows:

The complaint shall also allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and the reasons for the plaintiff's failure to obtain the action or for not making the effort.

business and affairs of the corporation" and the "decision to bring a law suit or to refrain from litigating a claim on behalf of a corporation is a decision concerning the management of the corporation." *Levine v. Smith,* 591 A.2d 194, 200 (Del.1991), *overruled on other grounds by Brehm v. Eisner,* 746 A.2d 244, 253 n. 13 (Del.2000).

Although relying heavily on Delaware law in their analysis, Plaintiffs suggest that the Court should not necessarily rely on such law but instead look to the plain language of RCW 23B.07.400(2) and a two-page unpublished case from the Middle District of Tennessee discussing Tennessee's procedural demand requirement statute, which is identical to the Washington State statute. *See In re Direct General Corp. Sec. Litig.,* 2005 WL 1895638 (M.D.Tenn. Aug. 3, 2005). The *Direct General* Court's analysis of the demand requirement was extremely limited, finding "that the allegations of the Verified Complaint are sufficient to excuse the demand otherwise required under Tennessee law" and that the plaintiffs had "shown that the decision-makers' interests and independence herein are sufficiently compromised by the actual allegations against them to excuse demand." *Id.* at *1. The single Tennessee state law case relied upon by *Direct General* cites extensively to Delaware demand requirement and business judgment rule cases. *See Lewis v. Boyd,* 838 S.W.2d 215, 222 (Tenn.App. 1992), (citing *Aronson v. Lewis,* 473 A.2d 805, 814 (Del.1984) and *Levine,* 591 A.2d at 212, regarding interestedness and independence). Thus, *Direct General* does not provide support for Plaintiffs' contention that Washington State courts would deviate from the long-held corporate law standards of Delaware, nor does it provide any analysis that is useful in disposing of this motion to dismiss.

Rather than simply rely on *Direct General* as Plaintiffs suggest, this Court must attempt to "predict how the highest court of the state would decide the case if presented with the case today." *See Boland v. Engle,* 113 F.3d 706, 710 (7th Cir.1997). The *Boland* Court noted that this analysis may involve the consideration of relevant authority of other jurisdictions that have addressed the issue. *Id.* at 711–12 (noting that "Delaware corporate law is undoubtedly persuasive authority" but concluding that it is not necessarily dispositive). Ultimately, the *Boland* Court found the trend towards narrowing the exceptions to the demand requirement persuasive and held that Boland's failure to make a demand was not excused. *Id.* at 713–14. In this Case, RCW 23B.07.400(2) strongly implies the existence of a substantive demand requirement in Washington State as does the underlying policy rational (i.e., business decisions are within the province of the Board of Directors and a shareholder demand is a business decision). Accordingly, the Court concludes that the Washington State Supreme Court would likely adopt the substantive demand requirement and apply a similar, if not the same, exception for futility as that employed in Delaware.

## B. Shareholder Demand Requirement and the Futility Exception

As described by the Supreme Court of Delaware, "the right of a stockholder to prosecute a derivative suit is limited to situations where the stockholder has demanded that the directors pursue the corporate claim and they have wrongfully refused to do so or where demand is excused because the directors are incapable of making an impartial decision regarding such litigation." *Rales v. Blasband,* 634 A.2d at 932. Plaintiffs acknowledge that no demand was submitted to Cray's Board of Directors in this case. VADC ¶ 119. Accordingly, dismissal is required unless Plaintiffs' failure to comply with the demand requirement was excused under the

so-called "futility" exception. *See Rales,* 634 A.2d at 933–34.

■ Where, as in this case, the plaintiffs in a derivative suit do not challenge any specific decision of the board, courts must "examine whether the board that would be addressing the demand can impartially consider its merits without being influenced by improper considerations." *Id.* at 934.⁴ Courts must look to the complaint and determine "whether or not the *particularized factual allegations* of a derivative stockholder complaint create a *reasonable doubt* that, as of the time the complaint is filed, the board of directors could have properly exercised its *independent and disinterested* business judgment in responding to a demand." *Id.* (emphasis added). As one court described it, "the entire review is factual in nature." *In re Cendant Corp. Derivative Litig.,* 189 F.R.D. 117, 128 (D.N.J.1999) (citing *Aronson,* 473 A.2d at 814). The inquiry requires courts to look to the totality of the circumstances in assessing whether a complaint creates a "reasonable doubt" concerning the board's independence or disinterestedness:

> Terms like reasonable doubt, for example, help guide judgment but, are not scientific. In making the required judgment no single factor—such as receipt of directorial compensation; family or social relationships; approval of the trans-action attacked; or other relationships with the corporation (e.g., attorney or banker)—may itself be dispositive in any particular case. Rather the question is whether the accumulation of all factors creates the reasonable doubt to which *Aronson* refers.

*Harris v. Carter,* 582 A.2d 222, 229 (1990). "[T]he concept of reasonable doubt is akin to the concept that the stockholder has a 'reasonable belief' that the board lacks independence." *Grimes v. Donald,* 673 A.2d 1207, 1217 n. 17 (Del.1996), *overruled on other grounds by Brehm v. Eisner,* 746 A.2d 244, 253 n. 13 (Del.2000).

Based on these standards, Plaintiffs' failure to make a demand is excused for futility only if a majority (five) of the members of Cray's Board of Directors, as constituted at the time of filing the VADC, were either "interested" or "lacked independence." Although the Plaintiffs allege 16 separate reasons why a majority of the members of Cray's Board were either interested or lacked independence (meaning a demand on Cray would have been a "futile, wasteful and useless act"), Plaintiffs discuss only four of these allegations in their opposition to Defendants' demand requirement motion. *See* VADC ¶ 119(a), (c)-(e); Pls.' Opp., at 11–15. The Court limits its analysis of Plaintiffs' futility allegations to only those that Plaintiffs support with argument.⁵

---

4. In cases where the plaintiff challenges a specific transaction, the demand requirement may be excused where the plaintiff can show that the transaction was not a product of a valid exercise of the defendants' business judgment. *See Aronson,* 473 A.2d at 814. Here, Plaintiffs do not suggest that this prong of *Aronson* is applicable.

5. Even a cursory review of the remaining allegations reveals that they are generic and conclusory under the "interested" and "independent" standards discussed below. *See* ¶¶ 119(b) (allegation that current directors are not independent of compensation committee),

(f) (allegation that directors breached fiduciary duties), (g) (generic allegation of interrelated familiar, business, professional and personal relationships), (h) (generic allegation of knowledge of and/or benefits from wrongdoing), (i) (generic allegation of participation in and/or approval of wrongdoing), (j) (generic allegation that directors would be forced to sue themselves), (k) (repeated allegation of fiduciary duty violations), (*l*) (generic allegation that Board authorized and/or permitted false statements), (m) (allegation that suit by current directors would "likely expose" directors and officers to further violations of securities laws), (n) (allegation that Cray will

### 1. Interested Board Members

■ The *Rales* Court succinctly described the "interest" considerations as follows: "A director is considered interested where he or she will receive a personal financial benefit that is not equally shared by the stockholders. Directorial interest also exists where a corporate decision will have a materially detrimental impact on a director, but not on the corporation and the stockholders." 634 A.2d at 936. However, "the mere threat of personal liability for approving a questioned transaction, standing alone, is insufficient to challenge ... [the] disinterestedness of directors." *In re Sagent Tech., Inc., Derivative Litig.*, 278 F.Supp.2d 1079, 1089 (N.D.Cal.2003) (quoting *Aronson*). In other words, "[a] plaintiff may not bootstrap allegations of futility by pleading merely that the directors participated in the challenged transaction or that they would be reluctant to sue themselves." *Id.* (citations omitted).

In *Sagent*, plaintiffs alleged that a demand was futile because three of the six board members were either interested or lacked independence. 278 F.Supp.2d 1079, 1088 (N.D.Cal.2003). One member, Zicker, was allegedly interested because he sold common stock for more than $1.3 million in proceeds. *Id.* 1088–89. Plaintiffs alleged that Zicker did so while "in possession of material, adverse nonpublic information." *Id.* The *Sagent* Court concluded that this generic allegation was insufficient to demonstrate "a substantial likelihood" that Zicker would be liable for insider trading. *Id.* at 1089. Additionally, the plaintiffs in *Sagent* alleged that the members of Sagent's Audit Committee "failed to establish and maintain adequate

be exposed to further losses), (*o*) (allegation that allowing derivative suit to move forward would expose directors to liability in the class action suits), (p) (allegation that directors may face uninsured liability).

internal accounting controls and to ensure that the company's financial statements were based on accurate information." *Id.* at 1084–85. However, they apparently did not allege that this failure rendered the audit committee interested.

■ At the time Plaintiffs filed this derivative suit, the members of Cray's Board of Directors included Rottsolk, Smith, Jones, Kennedy, Kiely, Lederman, Narodick, Regis, and Richards. Plaintiffs' opposition brief relies on only two allegations to demonstrate interestedness: (1) Regis, Richards, Narodick, and Lederman are interested because they are members of Cray's Audit Committee ("Audit Committee Directors") (VADC ¶ 119(e)); and (2) Rottsolk, Smith, Kennedy, and Regis are interested because they sold Cray stock during the Relevant Period ("Selling Directors") (VADC ¶ 119(a)).[6] Pls.' Opp., docket no. 22, at 12–15. Because Plaintiffs must demonstrate that a total of five members were interested or lacked independence, the demand requirement is only excused if they establish that one group or the other is interested *and* there is at least one additional director who was either interested or who lacked independence (for a total of five). The Court turns now to an examination of the allegedly interested directors.

#### a. Audit Committee Directors

According to Cray's 2005 Proxy, Cray's Audit Committee "assists the Board of Directors in fulfilling its responsibility for oversight of" the following: "[1] the quality and integrity of [Cray's] accounting and financial reporting processes and the audits of [Cray's] financial statements; [2]

6. Plaintiffs allege that Johnson and Poteracki sold stock during the Relevant Period. VADC ¶ 115. However, those Defendants were not directors when this action commenced.

the qualifications and independence of the public auditing firm engaged to issue an audit report on [Cray's] financial statements; [3] the performance of [Cray's] systems of internal controls, disclosure controls and internal audit functions, and [4] [Cray's] procedures for legal and regulatory compliance, risk assessment and business conduct standards." VADC ¶ 29(A). Plaintiffs allege that these duties required the Audit Committee to review and discuss financial reporting and accounting policies with management and auditors, review and approve SEC filings in advance, oversee disagreements between management and auditors, and recommend whether financial statements should be included in the 10–K Reports. *Id.*

In their opposition brief, Plaintiffs argue that three cases support their contention that Cray's Audit Committee Directors are interested under the *Rales* test.[7] *Cendant*, 189 F.R.D. 117; *In re Lernout & Hauspie Sec. Litig.*, 286 B.R. 33 (D.Mass. 2002); *In re Oxford Health Plans, Inc. Sec. Litig.*, 192 F.R.D. 111 (S.D.N.Y.2000). First, Plaintiffs state that the *Cendant* Court "found demand to be futile in part because it was the Audit Committee's responsibility to catch and correct the accounting irregularities." Resp. Br. at 13. This interpretation of *Cendant* is mistaken. Plaintiffs cite the "Background" section of the *Cendant* Court's Order, which noted that the Audit Committee was "specifically informed" that its income was overstated prior to the date Cedant publicly announced that information and, while in possession of this information, several members of the Audit Committee sold a total of 1.8 million shares of Cedant stock in the months before the announcement.

189 F.R.D. at 125; Pls.' Opp., at 13 n. 14. However, the "Demand" section of the *Cendant* Court's analysis is devoid of any suggestion that the Audit Committee members were interested merely because they were on the Audit Committee. *Id.* at 128–29 (citing instead the benefits directors received from transactions, the sale of millions of shares of stock by directors while in possession of adverse information, and the "significant personal liability" directors faced from a pending class action suit). In this case, the VADC alleges only that the Audit Committee "recommended that the Board include the improper financial statements and publish the improper and misleading press releases throughout the Relevant Period" and that such actions breached the Audit Committee's fiduciary duties. VADC ¶ 119(e). *Cendant* provides no helpful analysis as to these demand futility allegations.

Second, *Lernout* is inapposite as it provides no analysis of the demand requirement and addressed only a motion to dismiss for failure to allege facts sufficient to state claims for breach of fiduciary duties. *Lernout* did not apply the "interestedness" standard established in *Rales* and, in fact, involved class action claims under Section 10(b) of the Securities Exchange Act rather than a derivative action. 286 B.R. at 37–38.

Finally, the *Oxford* Court offered a lengthy recitation of the demand futility standards and proceeded to conclude demand was excused without any discussion of which specific directors were interested or lacked independence. 192 F.R.D. at 115–18 (concluding that it "appears unnecessary . . . to address the issue of the

---

7. At argument, Plaintiffs' counsel stated that they also relied on *In re Caremark Int'l, Inc., Derivative Litig.*, 698 A.2d 959 (1996), to support the argument that the Audit Committee is "interested." *Caremark* was discussed in Plaintiffs' brief with regard to the exculpatory provisions in Cray's bylaws and was not discussed in the "Audit Committee" section of Plaintiffs' brief. *See* Pls.' Opp., at 12–13, 15–16. In any event, *Caremark* is also discussed below.

independence or disinterestedness of the Directors individually"). Instead, the *Oxford* Court looked generally to the insider trading allegations. *Id.* at 117–18. Contrary to Plaintiffs' suggestion, *Oxford* is devoid of any discussion regarding the interestedness of the Audit Committee but merely states generally, and without citation, that knowledge of another's improper insider trading is enough to demonstrate interestedness. *Oxford* does not support Plaintiffs' contention that the Audit Committee Directors are interested by virtue of their place on the Audit Committee.

Plaintiffs' additional reliance on *Caremark* is also misplaced. *Caremark* did not address demand futility, but only stated the liability standard for certain breaches of the duty of care. 698 A.2d at 970 (director's obligation includes a duty to attempt in *good faith* to assure that a corporate information and reporting system exists and failure to do so may, in theory, render a director liable for losses caused by non-compliance). The *Caremark* Court held that "only a sustained or systematic failure of the board to exercise oversight—such as an utter failure to attempt to assure a reasonable information and reporting system exists—will establish the lack of good faith that is a necessary condition to liability." *Id.* at 971. The Court described such a claim as "possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment" and noted that, even if the harm to the corporation was caused by a violation of the criminal law, it is not necessarily enough to create a breach of fiduciary duty. *Id.* at 967, 972. To demonstrate that the Audit Committee is interested as the result of a possible *Caremark* claim, Plaintiffs must provide "particularized factual allegations" that the members face a "materially detrimental impact" if the claim were to proceed. *See Rales,* 634 A.2d at 934, 936. The "mere threat" of liability under a *Caremark* claim is not enough. *Sagent,* 278 F.Supp.2d at 1089. Although the VADC alleges broadly that Cray was "virtually devoid of internal controls, processes and procedures in every area of the finance and accounting departments," Plaintiffs have not provided "particularized factual allegations" suggesting that (assuming this characterization is true for purposes of the motion) it was the result of a "sustained or systematic failure" by the Audit Committee. *See* VADC 119(e).

In sum, Plaintiffs' "demand futility" cases do not stand for the proposition that a committee assigned the general oversight responsibility of the activities underlying a derivative complaint (e.g., establishing accounting controls and guarding against irregularities) is *per se* "interested." Nor have Plaintiffs adequately alleged facts that suggest a substantial likelihood of liability under a *Caremark* duty of care claim. Plaintiffs must allege facts that state "with particularity" the manner in which a given director is interested. See RCW 23B.07.400(2). The mere threat of personal liability alone is insufficient. *Sagent,* 278 F.Supp.2d at 1089. Plaintiffs' generic allegation regarding the Audit Committee Directors fails to demonstrate that those Directors are interested.

### b. Insider Sales

The VADC alleges that the Selling Directors include Rottsolk, Smith, Regis, and Kennedy. VADC ¶ 119(a). In its motion to dismiss, Cray contends that (1) Kennedy was an outside director presumed to have no information about day-to-day company affairs, and (2) Kennedy's one sale occurred in August 2003, which, while in the Relevant Period, was before the FY 2004 issues Plaintiffs rely upon. In response, Plaintiffs apparently abandon the allegation that Kennedy is interested as a result of his single stock sale during the

Relevant Period. *See* Pls.' Opp., at 14 (no discussion of Kennedy). Accordingly, the Selling Directors, for purposes of this analysis, include only Rottsolk, Smith, and Regis.

The VADC alleges that the Selling Directors were privy to the adverse, non-public information regarding Cray's accounting systems when they sold shares of Cray stock during the Relevant Period. VADC ¶ 119(a). The Selling Directors engaged in at least nine separate sales during the Relevant Period. *Id.* ¶ 115 (Sales Schedule).[8]

In support of their argument that the Selling Directors were interested, Plaintiffs rely on a single unpublished opinion from the Delaware Chancery Court. *See Zimmerman v. Braddock (Zimmerman II),* 2005 WL 2266566, 2005 Del. Ch. Lexis 135 (Del. Ch.2005). In *Zimmerman II,* nominal defendant Priceline licensed its technology to a separate privately-held company, WebHouse, in return for royalties. *Id.* at 2005 WL 2266566, *2, 2005 Del. Ch. Lexis 135, *8. In the derivative action, the plaintiff alleged that Priceline's management knew that WebHouse was losing $5 million a week and having technical problems causing the website to crash. *Id.* at 2005 WL 2266566, *2, 2005 Del. Ch. Lexis 135, *9. In spite of these problems, Priceline's management continued to publicly tout the prospects of the technology and its relationship with WebHouse. *Id.* at 2005 WL 2266566, *2, 2005 Del. Ch. Lexis 135, *10. During this period, three of Priceline's directors sold approximately $248 million worth of Priceline's stock in just 45 days. *Id.* at 2005 WL 2266566, *3 n. 21, 2005 Del. Ch. Lexis 135, *11 n. 21. In determining whether these three directors were interested for purposes of the demand futility analysis, the Delaware Chancery Court reasoned as follows:

> A reasonable inference from the Plaintiff's allegations is that the Selling Defendants had knowledge—directly and by imputation—of Priceline and WebHouse's problems. In addition, it is a reasonable inference that the public was not aware of Priceline's true predicament because its problems—even if they had been partially disclosed—were likely overshadowed by the public hyperbole of Priceline's executives.
>
> . . .
>
> When the sheer size of the trades (collectively, approximately $248 million dollars) is combined with the Plaintiff's well-pled allegations of insider trading culpability, the Selling Defendants, for motion to dismiss purposes, can be viewed as facing substantial personal liability even though the materiality of the trades (or the consequences of an action challenging them) to the Selling Defendants has not been specifically pled.
>
> . . .
>
> The question with regard to demand futility is whether the trading directors could impartially consider a shareholder's demand upon the corporation to pursue a claim against them based on their trades. In light of the allegations in the Second Amended Complaint and the value of the Selling Defendants' trades, it is a reasonable inference that the Selling Defendants would be personally and significantly concerned about, and opposed to, any such demand and, thus, interested in whether the Priceline Board would pursue a claim based on their trades.

*Id.* at 2005 WL 2266566, *7–8, 2005 Del. Ch. Lexis 135, *32–35. Also, in *Zimmer-*

---

8. Plaintiffs' schedule of stock sales omits Individual Defendant Smith. *Id.* at ¶ 115. Plaintiffs allege that Smith sold 49,548 shares for a total of $539,052 but do not provide the number of trades or dates of each trade. *Id.* at ¶ 119(a)(ii).

*man v. Braddock (Zimmerman I)*, 2002 WL 31926608, *8 n. 64, 2002 Del. Ch. LEXIS 145, *8 n. 64 (Del.Ch. Dec. 20, 2002), the selling defendants did not even contest the fact that they were interested as a result of the $248 million in stock sales, which was likely a consideration for the *Zimmerman II* Court. *Id.* at 2005 WL 2266566, *7, 2005 Del. Ch. Lexis 135, *29.

In this case, Plaintiffs contend that the Selling Directors were privy to inside information concerning "the complete absence of the Company's internal controls and the difficulties Cray was encountering producing and qualifying its new products" as a result of their positions as CEO (Rottsolk), employee (Smith), and Chairman of Cray's Audit Committee (Regis). Pls.' Opp., at 14. Plaintiffs cite no other allegations in the VADC that state what specific information Rottsolk, Smith, and Regis knew, or when they would have become aware, of such information in relation to each stock sale.

Cray argues that Plaintiffs' insider trading claims do not demonstrate "interestedness" because (1) Regis was (like Kennedy) an outside director, (2) Plaintiffs' allegations are conclusory and insufficient under the case law, and (3) the sales by Rottsolk and Smith were made pursuant to Rule 10b5–1 plans, which provides an affirmative defense. First, Cray notes that Regis was an outside director during the entire Relevant Period and that the law presumes that outside directors are not responsible for false or misleading information under the "group published information" rule. *See In re GlenFed, Inc., Sec. Litig.*, 60 F.3d 591, 593 (9th Cir.1995). In *GlenFed*, the Ninth Circuit held that "[m]erely because the complaint identifies a corporation's outside directors, various committee assignments, and generic responsibilities for every committee" does not mean such outside directors are responsible for information published on behalf of the group. *Id.* Plaintiffs do not directly respond to this argument and appear to rely only on the fact that Regis was the Chairman of Cray's Audit Committee.

Second, Cray contends that at least two cases applying Delaware law, *Sagent* and *Guttman v. Huang*, 823 A.2d 492 (Del.Ch. 2003), have held that similar insider trading claims were insufficient to demonstrate interestedness. In *Sagent*, the plaintiffs alleged that Zicker "sold 80,000 shares of Sagent common stock while in the possession of material, adverse, non-public information," reaping a $1.3 million profit. 278 F.Supp.2d at 1088. The *Sagent* Court concluded that the director was not interested because the complaint contained no allegation that the director was in possession of any particular material adverse information when he sold Sagent stock. *Id.* at 1089. Similarly, in *Guttman*, the complaint alleged that "each of the defendants who sold during the contested period was in possession of material, non-public information and traded to his personal advantage using that information." 823 A.2d at 496. The complaint also stated that "[e]ach of the defendants was in a position to know of the improper accounting practices engaged in by NVIDIA" and "[e]ach of the defendants engaged in trades shortly after NVIDIA released a financial statement that was later restated." *Id.* at 496–97. The *Guttman* Court concluded that these allegations were "wholly conclusory" and did not include "well-pled, particularized allegations of fact detailing the precise roles that these directors played at the company, the information that would have come to their attention in those roles, and any indication as to why they would have perceived the accounting irregularities." *Id.* at 503.

Finally, Cray contends that the trades by Rottsolk and Smith are subject to an

affirmative defense because those trades were effectuated under 10b5–1 plans that automatically dictated the amount and timing of the sales. For example, Rottsolk's scheduled sales included 15,000 shares each in August, September, October, and November 2003, and January 2004. VADC ¶ 115. In response, Plaintiffs argue that a ruling on this affirmative defense would only be appropriate in a summary judgment motion after the case has been developed factually through discovery. Plaintiffs are correct that the Court may not consider affirmative defenses at this juncture, particularly where Defendants have not yet filed an Answer to the VADC.

While the interestedness determination for insider sales is not entirely clear, the cases support Cray's contention that the Plaintiffs' allegations are insufficient. Both *Sagent* and *Guttman* analyzed nearly-identical allegations regarding insider sales and found those allegations conclusory and insufficient to demonstrate interestedness. In contrast, the more recent unpublished opinion in *Zimmerman II* held that similar allegations were sufficient to demonstrate interestedness. However, the *Zimmerman II* Court gave significant weight to the "sheer size of the trades (collectively, approximately $248 million dollars)," all of which occurred in 45 days. 2005 WL 2266566, *3, 7–8, 2005 Del. Ch. Lexis 135 at * 11, 33–35. That volume of trading is absent from this case, where the Selling Defendants sold a total of 161,527 shares of Cray stock for approximately $1.71 million in proceeds over a 16–month period. See VADC ¶¶ 115, 119(a) (sales occurred from August 2003 to December 2004). As a result, the weight of authority analogous to this case supports Defendants' argument and the Court concludes

that the Selling Directors were not interested.[9]

### 2. Independence of Board Members

The *Rales* Court described the "independence" considerations as follows:

[I]ndependence means that a director's decision is based on the corporate merits of the subject before the board rather than extraneous considerations or influences. To establish a lack of independence, [plaintiff] must show that the directors are beholden to the [interested directors] or so under their influence that their discretion would be sterilized.

634 A.2d at 936 (quotations and citations omitted). In *Telxon Corp. v. Meyerson,* the Delaware Supreme Court elaborated on this standard, stating as follows:

A controlled director is one who is dominated by another party, whether through close personal or familial relationship or through force of will. A director may also be deemed "controlled" if he or she is beholden to the allegedly controlling entity, as when the entity has the direct or indirect unilateral power to decide whether the director continues to receive a benefit upon which the director is so dependent or is of such subjective material importance that its threatened loss might create a reason to question whether the director is able to consider the corporate merits of the challenged transaction objectively.

802 A.2d 257, 264 (Del.2002).

In a single paragraph of argument, Plaintiffs contend that two members of Cray's Board, Rottsolk and Smith, are not independent. Pls.' Opp., at 11–12 (arguing Rottsolk and Smith are not independent

---

**9.** The Court also notes that, for the reasons discussed in Part II.B below, common law insider trading claims are not available in Washington State. Because the Selling Directors are not subject to personal liability for derivative insider trading claims, the sufficiency of the "interestedness" futility allegation is further diminished.

because they rely on substantial income from Cray as employees). Plaintiffs are correct. In *Rales*, the Court found that two members of the board (Sherman, the CEO, and Ehrlich, the President of a related company) lacked independence from two controlling directors where they received large salaries from the companies and, therefore, it could be inferred that they were beholden. 634 A.2d at 937.[10] Additionally, Defendants do not respond to Plaintiffs' argument that Rottsolk and Smith lack independence and, at argument, Defendants' counsel all but conceded that the Delaware cases hold as such. Therefore, the Court presumes that the argument has merit and concludes that Rottsolk and Smith are "interested" for purposes of this motion.

### 3. Plaintiffs have not Established that Demand was Futile

Under the demand futility analysis, Plaintiffs must demonstrate through the allegations contained in the VADC that a majority (five) of the members of Cray's Board of Directors are either interested or lack independence. *Rales*, 634 A.2d at 933–34. Plaintiffs have failed to make such a showing. The relevant case law does not hold that a director is interested merely by virtue of sitting on an Audit Committee while the corporation faces accounting and audit irregularities. Similarly, the weight of authority suggests that Rottsolk, Smith, and Regis are not inter-

ested as a result of having sold shares of Cray stock during the Relevant Period. Both *Sagent* and *Guttman* specifically held that insider sales such as those at issue here were insufficient, and the lone, unpublished case cited by Plaintiffs is distinguishable to the extent that the proceeds in this case ($1.71 million) are vastly disproportionate to *Zimmerman*, where the Court noted the "sheer size of the trades" ($248 million). Finally, the only directors who lack independence are Rottsolk and Smith.[11] Accordingly, the Court GRANTS Defendants' motion to dismiss for failure to comply with the pre-litigation demand requirement.

### II. *Individual Defendants' Motion to Dismiss* [12]

In addition to joining Cray's motion to dismiss for failure to comply with the demand requirement, the Individual Defendants move separately to dismiss the VADC for failure to comply with the pleading requirements in Rule 9(b), and failure to state claims upon which relief can be granted under Rule 12(b)(6). First, the Individual Defendants contend that the VADC alleges a "unified course of fraudulent conduct," requiring Plaintiffs to state those fraud allegations with particularity. Second, the Individual Defendants argue that Plaintiffs' two claims relating to insider trading may not be brought in a derivative action. See VADC ¶¶ 120–24 (Count

---

10. *But see Sagent*, 278 F.Supp.2d at 1089 (board members do not lack independence based solely on their positions and the monetary compensation they received in connection with their duties as employee and consultant for the company). However, the *Sagent* Court relied only on a pre-*Rales* case from Delaware for this proposition and, therefore, does not provide a helpful analysis. *See id.* (citing *Grobow v. Perot*, 539 A.2d 180, 188 (Del.1988)).

11. The Court notes that even if the Selling Directors were interested, Plaintiffs fail to demonstrate that a majority of Cray's Board is impartial because Rottsolk and Smith are in both groups.

12. The motion to dismiss for failure to adequately plead demand futility is also GRANTED as to the Individual Defendants, who incorporate that argument by reference into their motion to dismiss. The Court will also consider the Individual Defendants' separate motion to dismiss.

I: Breach of Fiduciary Duty for Misappropriate Information), 145–47 (Count VI: Unjust Enrichment). Third, the Individual Defendants contend that Plaintiffs' claims for breach of fiduciary duties, abuse of control, gross mismanagement, and waste (Counts II, III, IV, and V, respectively) must be dismissed because Plaintiffs fail to allege any cognizable claim for damages. Finally, the Individual Defendants contend that Plaintiffs' claim for corporate waste must also be dismissed for failure to allege facts sufficient to state a claim.

### A. Failure to Plead Fraud Under Federal Rule of Civil Procedure 9(b)

Under FED.R.CIV.P. 9(b), "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." In general, Rule 9(b) requires fraud allegations to include "the who, what, when, where, and how of the misconduct charged." *Vess v. Ciba–Geigy Corp., USA,* 317 F.3d 1097, 1106 (9th Cir.2003) (quotations omitted). The Ninth Circuit has distinguished between cases in which fraud allegations form the entire basis for a claim and cases in which there is both fraudulent and non-fraudulent conduct underlying a claim:

> In some cases, the plaintiff may allege a unified course of fraudulent conduct and rely entirely on that course of conduct as the basis of a claim. In that event, the claim is said to be "grounded in fraud" or to "sound in fraud," and the pleading of that claim as a whole must satisfy the particularity requirement of Rule 9(b).
>
> . . .
>
> In other cases, however, a plaintiff may choose not to allege a unified course of fraudulent conduct in support of a claim, but rather to allege some fraudulent and some non-fraudulent conduct. In such cases, only the allegations of fraud are

subject to Rule 9(b)'s heightened pleading requirement.

*Id.* at 1103–04 (citations omitted).

Here, the parties' dispute centers on whether any or all of Plaintiffs' claims are "grounded in fraud" such that they are entirely subject to Rule 9(b) or whether the fraud allegations may be addressed separately. The Individual Defendants argue that each claim is grounded in fraud because Plaintiffs incorporate by reference allegations of misrepresentation and concealment. *See* VADC ¶¶ 3, 4, 7, 41–42 (alleging knowing misrepresentations, concealment of facts, misleading of analysts, and conspiracy). The Individual Defendants contend that these allegations are conclusory and fail to allege what was false or misleading about the statements, which directors and officers knew they were misleading, and when they knew it.

■ In response, Plaintiffs first argue that a number of their claims do not rely on allegations of fraud. In particular, Plaintiffs refer to their claims for (1) breach of the fiduciary duties of good faith and due care, (2) gross mismanagement, and (3) waste. These claims are based in part upon allegations that the Individual Defendants failed to fulfill a duty to implement effective internal controls over Cray's financial reporting. *See* VADC ¶¶ 125–130 (breach of fiduciary duty of care and good faith), 136–140 (gross mismanagement), 141–144 (waste). This argument has merit. Plaintiffs allege that the Individual Defendants "abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Cray" and failed "to conduct proper supervision." *Id.* ¶¶ 137, 142. These allegations and the claims they support do not rely on or involve fraud. Under the distinction described in Vess, the breach of duty of care, mismanagement, and waste claims are not subject to Rule 9(b) and do not fail in their

entirety as the Individual Defendants contend.

Second, Plaintiffs argue that those claims dependant on averments of fraud may also stand because the VADC satisfies the "particularity" requirement of Rule 9(b). This argument is not well taken. In support of their position that they sufficiently alleged the "who, what, where, when, and how" of the fraud allegations, Plaintiffs simply cite to paragraphs 55, 63, 66–67, 75, 81, 93, 99, and 100 of the VADC, without further explanation. However, these allegations are largely conclusory and redundant. Paragraphs 55, 63, 66–67, 75, and 81 simply offer repeated citations to Cray's 10Q quarterly public disclosures, which each state (with some minor variation) in relevant part as follows:

> Based on the evaluation, our principal executive and financial officers each concluded that, as of the date of the evaluation, our disclosure controls and procedures were effective in providing reasonable assurance that material information relating to Cray and our consolidated subsidiaries is made known to management, including during the period when we prepare our periodic SEC reports.

*Id.* at ¶ 55. The VADC alleges only that, in fact, Cray "did not have sufficient internal controls to ensure either that revenue was properly recognized or that financial information was accurately reported." *Id.* at ¶ 56. Plaintiffs do not explain why or when Cray's CEO and CFO stopped concluding that Cray's procedures were effective, nor do they state how or when the other Individual Defendants would have learned of this information. Similarly, paragraphs 93, 99, and 100 merely cite Cray's disclosure that it expected to, and ultimately did, identify material weaknesses in its internal controls and accounting procedures. The VADC fails to explain how these disclosures, which are apparently pled to demonstrate that the earlier statements were false, establish that the Individual Defendants knew the earlier statements were false when made.

Finally, Plaintiffs argue that much of the evidence related to the fraud allegations is in the hands of the Individual Defendants, essentially seeking to excuse the generality of the VADC until they can obtain such evidence through discovery. *See U.S. Ex. Rel. Lee v. SmithKline Beecham, Inc.,* 245 F.3d 1048, 1052 (9th Cir.2001) ("Rule 9(b) may be relaxed to permit discovery in a limited class of corporate fraud cases where the evidence of fraud is within a defendant's exclusive possession."), *overruled on other ground by Hollinger v. Titan Capital Corp.,* 914 F.2d 1564, 1575 (9th Cir.1990). However, the cases allowing for a relaxed application of Rule 9(b) continue to require significant particularity in the pleading. *See, e.g., Wool v. Tandem Computers, Inc.,* 818 F.2d 1433, 1440 (9th Cir.1987) (fraud allegations are "very precise" and specify "the exact dollar amount of each alleged overstatement, and the manner in which such representations were false and misleading"); *Fed. Sav. and Loan Ins. Corp. v. Musacchio,* 695 F.Supp. 1053, 1058–59 (N.D.Cal.1988) ("In virtually every instance in which fraud is alleged the plaintiffs have set forth the time, place and manner of the allegedly fraudulent acts."). No such precision or specificity is present in the VADC. Thus, the Court also GRANTS the Individual Defendants' motion to dismiss the fraud allegations for failure to comply with Rule 9(b) and dismisses those claims without prejudice.[13]

---

13. The claims based in fraud include Count I (breach of fiduciary duty of loyalty and good faith for insider selling), Count II (breach of fiduciary duty of loyalty and good faith for improperly misrepresenting Cray's financial statements), part of Count V (waste caused by improper public statements, financial results

## B. Insider Trading Claims (Counts I and VI) Under Federal Rule of Civil Procedure 12(b)(6)

■ A motion to dismiss for failure to state a claim under FED. R. CIV. P. 12(b)(6) may be granted only where it appears beyond a reasonable doubt that the plaintiff can prove no set of facts that would entitle the plaintiff to relief. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). Allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party. *Smith v. Jackson,* 84 F.3d 1213, 1217 (9th Cir.1996). However, conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss. *Associated Gen. Contractors v. Metro. Water Dist. of So. Cal.,* 159 F.3d 1178, 1181 (9th Cir.1998).

The Individual Defendants raise four arguments in support of their motion to dismiss the insider trading claims (Counts I and VI) for failure to state a claim: (1) not all of the Individual Defendants sold stock during the relevant period and those that did not should be dismissed as to the insider trading claims; (2) several of the Selling Defendants sold pursuant to 10b5–1 plans, which provides an affirmative defense; (3) several of the Selling Defendants *purchased* and continued to hold shares during the Relevant Period; and (4) there is no common law derivative cause of action for insider trading because Cray sustained no damages. Defs.' Mot. at 6–9.

The Individual Defendants' first three arguments are not well developed and are without merit in the context of a 12(b)(6) motion to dismiss. First, the VADC refers to the "Insider Selling Defendants" in Count I and the "defendants" in Count VI.

See VADC ¶¶ 120–124, 145–147. Plaintiffs specify which Individual Defendants sold Cray stock during the Relevant Period. *Id.* ¶ 115.[14] Thus, under the minimal notice pleading requirement of Rule 8(a), the VADC adequately identifies the Individual Defendants at issue in Counts I and VI. Second, the 10b5–1 argument is, as the Individual Defendants acknowledge, an affirmative defense. The Individual Defendants have filed no Answer to the VADC and, therefore, alleged no affirmative defenses. The Court will not dismiss the insider sales claims on the basis of a yet-to-be-pled affirmative defense, particularly where the Individual Defendants bear the burden of proof. *See* T. HAZEN, THE LAW OF SECURITIES REGULATION § 12.17 (5th ed.2002) (noting that courts require the defendant to demonstrate that stock sales were made pursuant to a 10b5–1 plan). Third, the Individual Defendants do not support their argument that Smith, Johnson, Rottsolk and Poteraki should be dismissed because they purchased and held additional shares during the Relevant Period. The Individual Defendants cite no authority for the proposition that a defendant's purchase of stock during a period of allegedly unlawful insider sales entitles them to dismissal.

■ The more closely contested issue is whether a common law derivative claim for insider selling even exists. The Individual Defendants cite two cases holding that such claims are not available and a leading corporate law treatise stating that a majority of courts are in agreement. *See Freeman v. Decio,* 584 F.2d 186, 192–95 (7th Cir.1978) (claim dismissed because (1) no damages to corporation and (2) defendants would be subject to double liability

and prospectus), and Count VI (unjust enrichment for insider selling on the basis of misrepresented financial information).

**14.** Plaintiffs have, however, mistakenly omitted Defendant Smith from this schedule, but they name Smith as a Selling Defendant in paragraphs 15 and 119(a).

given availability of Rule 10b(5) claims); *Frankel v. Slotkin*, 795 F.Supp. 76, 79–80 (E.D.N.Y.1992) (claim dismissed for lack of actual damage to the corporation); 3A WILLIAM M. FLETCHER, FLETCHER CYCLOPEDIA OF THE LAW OF PRIVATE CORPORATIONS § 1174 (perm. ed. 2002) ("[M]ost courts considering the issue have rejected a common law corporate cause of action against directors and officers for insider trading"). The Individual Defendants also note that Washington State generally requires a showing of damages for breach of fiduciary duty and unjust enrichment claims. *See Interlake Porsche Audi, Inc. v. Bucholz*, 45 Wash.App. 502, 509, 728 P.2d 597 (1986) (showing of proximate causation of loss sustained by corporation required); *Bailie Communications, Inc. v. Trend Bus. Sys., Inc.*, 61 Wash.App. 151, 159, 810 P.2d 12 (1991) (unjust enrichment claim requires showing defendants enriched themselves at the expense of the corporation).

In response, Plaintiffs rely heavily on *Brophy v. Cities Service Company*, 70 A.2d 5, 8 (Del.Ch.1949), which held that "[i]n equity, when the breach of a confidential relation by an employee is relied on and an accounting for any resulting profits is sought, loss to the corporation need not be charged in the complaint." *See also Diamond v. Oreamuno*, 24 N.Y.2d 494, 301 N.Y.S.2d 78, 83, 248 N.E.2d 910 (1969) (relying on *Brophy* in holding that there may be an insider trading claim); *Walton v. Morgan Stanley & Co., Inc.*, 623 F.2d 796, 798 (2d Cir.1980) (stating that Delaware courts have "consistently followed" *Brophy's* holding that a breach of fiduciary duty is actionable absent an injury without analyzing *Brophy's* continued viability after the implementation of 10b(5) liability). In *Brophy*, the plaintiff alleged that the insider defendant had knowledge of the corporation's plan to buy back its own stock on certain prearranged dates. 70 A.2d at 6. The plaintiff further alleged that the defendant breached a duty of trust to the corporation by purchasing shares of the corporation's stock for himself just before the buy-back and then selling the shares after the buy-back for a profit. *Id.* Plaintiffs' reliance on *Brophy* is misplaced. In *Freeman*, the Seventh Circuit examined the continued viability of *Brophy* in 1978 and reasoned that allowing derivative common law claims for insider trading would create the problem of double liability because a statutory remedy was available under Rule 10b(5). 584 F.2d at 195–96. The *Freeman* Court also distinguished *Brophy* on the grounds that, at least implicitly, the *Brophy* Court recognized that the corporation did suffer potential harm in becoming a competitor in the market for its own stock with the insider defendant who purchased shares contemporaneously. *Id.* at 194.

Plaintiffs also cite an inapposite section of Fletcher's treatise on corporations, which is inconsistent with the section relating specifically to the insider trading cases cited above. *See* Pls.' Opp., at 14 (citing FLETCHER, CYCLOPEDIA OF THE LAW OF PRIVATE CORPORATIONS at § 888). Finally, Plaintiffs cite the *Zimmerman II* Court's conclusion that the plaintiff had adequately pled an insider trading claim where defendants sold approximately $248 million in Priceline stock with the knowledge that Priceline's business relationship with WebHouse was not succeeding. 2005 WL 2266566 at *8 n. 84, 2005 Del Ch. Lexis 135 at *8 n. 84 (2005) (unpublished).

The Individual Defendants' argument with regard to the unavailability of insider trading derivative claims has merit. The Court finds persuasive the Seventh Circuit's reasoning that *Brophy* is no longer relevant in this context because it was decided well before private causes of action were available to individual shareholders under Rule 1 0b(5). There is also no dispute that Washington State case law

acknowledges the general requirement that damages are an essential element of derivative claims for breach of fiduciary duties and unjust enrichment. Thus, although it is an open question, the Court also concludes that the Washington State courts would decline to adopt a common law derivative claim for insider trading where there is no allegation of damage to the nominal defendant corporation.

The Court GRANTS the Individual Defendants' motion to dismiss Counts I (breach of fiduciary duties by insider selling defendants) and VI (unjust enrichment) of the VADC for this reason as well.

## C. Failure to Adequately Plead Damages (Counts II–V)

The Individual Defendants contend that Counts II (breach of fiduciary duties), III (abuse of control), IV (gross mismanagement) and V (corporate waste) must be dismissed because the VADC fails to allege any recoverable damages. Counts II through IV simply state that Cray has "sustained significant damages." VADC ¶¶ 129, 133, 138. Count V alleges that the Individual Defendants caused Cray to waste corporate assets by "paying incentive based bonuses to certain of its executive officers and incur [sic] potentially millions of dollars of legal liability and/or legal costs to defend defendants' unlawful actions." *Id.* ¶ 142. Plaintiffs' opposition brief suggests that these claims are based on allegations that Cray sustained damages in the form of (1) costs incurred to carry out internal investigations of, and defend against, potential legal liability from the pending class action lawsuit, and (2) harm to Cray's corporate image and good will that impairs Cray's ability to raise equity capital or debt. *Id.* ¶¶ 38–39, 104. The Individual Defendants maintain that these damage allegations are speculative and unrecoverable.

## 1. Costs of Investigating and Defending Class Action

■ The Individual Defendants rely on several cases holding that legal costs and potential legal liability arising out of a separate class action suit are not recoverable damages in a derivative action. *See* Defs.' Mot., at 10. For example, in *In re Symbol Technologies Securities Litigation*, the complaint alleged as damages that the corporation might be "caused to pay amounts with regard to the claims asserted in the Class Action, or [ ] caused to pay any legal fees and incidental expenses in connection with defending such claims." 762 F.Supp. 510, 516 (E.D.N.Y. 1991). The District Court in *Symbol* deemed such damages unrecoverable because they were contingent on the outcome of a class action suit in which no judgment had been entered or settlement reached. *Id.* The Individual Defendants provide four other unpublished district court cases applying the same reasoning. *See Dollens v. Zionts*, 2002 WL 1632261 *9 (N.D.Ill.2002); *In re United Telecomms., Inc., Sec. Litigation*, 1993 WL 100202 *3 (D.Kan.1993); *Daisy Sys. Corp. v. Finegold*, 1988 WL 166235 *4 (N.D.Cal.1988); *Falkenberg v. Baldwin*, 1977 WL 1025 *4 (S.D.N.Y.1977).

In response, Plaintiffs cite only a single unpublished case attached as a slip opinion to their Response brief. *See Mehlenbacher v. Jitaru*, Case No. 04–cv–1118–Orl–22KRS (M.D. Fl. June 6, 2005). In *Mehlenbacher*, the plaintiff brought an indemnity and contribution claim alleging damages for legal costs incurred by "the SEC investigation, the securities fraud class actions, and the internal investigations of the Company." Slip Op. at 10. The class action had been voluntarily dismissed without payment of settlement. *Id.* at 9. Without discussion or citation to analogous cases, the District Court in *Mehlenbacher* simply concluded that "Count II may not

be a model of pleading, but it does pass muster under the liberal Fed.R.Civ.P. 8(a) standard." *Id.* at 10. *Mehlenbacher* is not instructive due to its lack of analysis or support. In contrast, *Symbol Technologies, Dollens, United Telecommunications, Daisy Systems*, and *Falkenberg* each held that derivative claims are foreclosed when they merely allege damages based on the potential costs of investigating, defending, or satisfying a judgment or settlement for what might be unlawful conduct. The Court concludes that Plaintiffs' damage allegations based on potential costs of the class action suits are insufficient to state a claim for relief.

### 2. Loss of Goodwill and Increased Financing Costs

The Individual Defendants argue that Plaintiffs cannot recover damages based on allegations of lost goodwill and a "liar's discount" that will potentially increase the costs of obtaining financing. VADC ¶¶ 39, 104, 142. Again, the Individual Defendants rely on *Symbol Technologies* and similar cases which dismissed claims for such damages. 762 F.Supp. at 517 (allegation that defendants undermined the company's credibility in the marketplace was "boilerplate" and insufficient to withstand motion to dismiss). *See also United Telecomms.*, 1993 WL 100202 at \*2; *Dollens*, 2002 WL 1632261 at \*9.

In response, Plaintiffs cite only the unpublished *Cement–Lock v. Gas Technology Institute*, 2005 WL 2420374 at \*13 (N.D.Ill.2002), in which the plaintiff alleged the following damages:

> (1) misappropriation of millions of dollars in grant money, which prevented the development of the Technology and results in the future loss of profits from the licensing of the Technology; (2) *harm to Cement–Lock Group's business reputation;* (3) lost business opportunities to market the Technology to other individuals, corporations, or governmental entities, including Taiwan, Hong Kong, and China; and (4) devaluation of Cement–Lock Group's intellectual property by wasted years in the lifespan of certain patents and confusion and infringement on the Technology's service mark and trademark.

(Emphasis added). With reference to all of these allegations, the *Cement–Lock* Court stated only: "Such damages are neither speculative nor remote. Under the common law, concrete injury to business reputation will satisfy the injury element of standing." *Id.*

While there is some inconsistency in the case law (i.e., *Symbol Technologies, United Telecommunications*, and *Dollens* versus *Cement–Lock*), the weight of authority suggests that lost goodwill and business reputation damage allegations must be more than speculative and conclusory. Moreover, *Cement–Lock* is in agreement to a degree, requiring "concrete" injury to a corporation's business reputation. Here, Plaintiffs bring only a single allegation that specifies any present damage to Cray. VADC ¶ 104 (alleging that "the fees, interest rates and terms" of a June 1, 2005, credit agreement "were far less favorable than those that would have been available to a well managed company with established and fully functioning internal financial controls"). This allegation is conclusory, failing to identify the fees, interest rate or terms, or to provide any explanation as to how the credit agreement was unfavorable. Accordingly, the Court concludes that Counts II through V fail to identify recoverable damages for loss of goodwill or business reputation and GRANTS the Individual Defendants' motion to dismiss without prejudice for this reason as well.

### D. Failure to Allege Waste of Corporate Assets (Count V)

 Finally, the Individual Defendants contend that Plaintiffs' claim for

waste of corporate assets (Count V) should also be dismissed for failure to state a claim under Rule 12(b)(6). Corporate waste is defined as "an exchange of corporate assets for consideration so disproportionately small as to lie beyond the range at which any reasonable person might be willing to trade." *Lewis v. Vogelstein*, 699 A.2d 327, 336 (Del.Ch.1997). In this case, Plaintiffs allege that the Individual Defendants caused Cray to engage in corporate waste "by paying incentive based bonuses to certain of its executive officers and incur [sic] potentially millions of dollars of legal liability and/or legal costs to defend defendants' unlawful actions." VADC ¶ 142. The Individual Defendants argue that this claim must fail because (1) there is no allegation the bonuses were made without consideration or constituted a gift, and (2) there is no allegation that the costs associated with defending the pending legal actions are egregious or irrational. *See Lewis*, 699 A.2d at 336 (no corporate waste where any substantial consideration was received by the corporation); *White v. Panic*, 783 A.2d 543, 554 n. 36 (Del.2001) (corporate waste claim requires plaintiff to show (and by implication allege) that the board's decision was egregious and irrational). Plaintiffs provide no opposition to this argument. Because the corporate waste allegation is unsupported and there is no opposition from the Plaintiffs, the Court GRANTS the Individual Defendants' motion to dismiss Count V without prejudice.

### Conclusion

For the reasons stated above, the Court rules as follows:

The joint motion by Cray and the Individual Defendants to dismiss for failure to comply with the pre-litigation demand requirement, docket no. 18, is GRANTED and the VADC is DISMISSED WITHOUT PREJUDICE.

The Individual Defendants' motion to dismiss for failure to comply with Rule 9(b), docket no. 16, is GRANTED IN PART and DENIED IN PART. The motion is GRANTED as to specific allegations of fraud and misrepresentation and those claims are DISMISSED WITHOUT PREJUDICE. The motion is DENIED as to the request to dismiss Counts I through VI in their entirety.

The Individual Defendants' motion to dismiss Counts I and VI for failure to state breach of fiduciary duty and unjust enrichment claims on the basis of insider selling, docket no. 16, is GRANTED. Counts I and VI are DISMISSED WITH PREJUDICE.

The Individual Defendants' motion to dismiss Counts II through V, docket no. 16, is GRANTED. Counts II through V are DISMISSED WITHOUT PREJUDICE.

IT IS SO ORDERED.